620 A.2d 712

COMMONWEALTH of Pennsylvania, DEPARTMENT
OF TRANSPORTATION, Petitioner,

v.

E–Z PARKS, INC., Respondent.

E–Z PARKS, INC., Petitioner,

v.

DEPARTMENT OF TRANSPORTATION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 20, 1992.

Decided Feb. 4, 1993.

William J. Cressler, Asst. Chief Counsel, for petitioner/respondent, Dept. of Transp.

Bruce L. Thall, for respondent/petitioner, E–Z Parks, Inc.

Before DOYLE and SMITH, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

The question before this Court is whether the Board of Claims erred as a matter of law in its interpretation of a contract between E–Z Parks, Inc., and the Department of Transportation (DOT). We hold that the Board of Claims so erred.

The prolonged history of this case began in 1972, when DOT condemned eighty-seven tracts of land located along Vine Street in Philadelphia for the purpose of constructing a limited access highway (Expressway). The Expressway project was delayed throughout the 1970s due to lack of funding and the need to comply with the National Environmental Policy Act of 1969.[1] The buildings located on the right-of-way acquired were demolished, including the buildings located on Lot 7, the subject property of this litigation. DOT offered the right-of-ways for lease as surface parking lots to private parties because of the project's delay. E–Z Park leased nine separate properties from DOT, including Lot 7, beginning in 1973 pursuant to a written lease, renewable on a month-to-month basis.[2]

In the spring of 1981, the Pennsylvania Auditor General's office issued a report that found the surface parking leases along Vine Street undervalued. In response, DOT implemented a competitive bidding process for the leases beginning in June, 1981. All surface parking operators, including E–Z Parks were notified that their leases would be terminated, if necessary, to grant a new lease to the highest bidder. E–Z Parks bid on Lot 7, as did the Philadelphia Parking Authority (PPA). The high bidder was J. Faunce Corporation, a company owned by Robert Spear, son of Leon Spear, one of the principals of E–Z Parks.[3]

---

1. 42 U.S.C. §§ 4321–4370a.

2. On March 13, 1974, the General Assembly amended Section 2002 of the Administrative Code, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 512, enabling the Commonwealth to lease land acquired by it which was not needed for the free movement of traffic. E–Z Parks continued to lease Lot 7 pursuant to this amendment.

3. The high bid on Lot 7 was $48,700 as compared to the $8,400 annual rental previously paid by E–Z Parks.

However, several of the parking operators, including E–Z Parks, filed an injunction to terminate the leases awarded by competitive bidding. On appeal, the Supreme Court affirmed in part and reversed in part the order granting the injunction. *Ezy Parks, Inc. v. Larson*, 499 Pa. 615, 454 A.2d 928 (1982).[4]

In December 1982, a draft Environmental Impact Statement (EIS) was issued, addressing alternatives to the construction of the Expressway. The draft EIS addressed three main alternatives: no build, scaled-down Expressway and modified arterial. Following the January 31, 1983 public hearing, concerning the EIS draft, DOT continued negotiations for the lease of Lot 7 with E–Z Parks. DOT made no representations during negotiations of PPA's desire to construct a public parking garage on Lot 7. On May 27, 1983, DOT and E–Z Parks entered into a five-year lease agreement that included a termination clause which permitted DOT to terminate if "any portion of the premises is required for construction of the highway or related transportation purposes." [5]

On August 11, 1983, E–Z Parks wrote DOT expressing interest in developing Lot 7 into a multi-level parking garage. DOT responded on October 13, 1983, indicating that PPA was interested in the site and that public agencies had a right to lease the right-of-way following the interim lease.

4. The parking lot operators' action, seeking to enjoin termination of the leases granted under the competitive bidding process, was based on allegations that, contrary to the leases, DOT personnel represented that the operators would be entitled to remain on the right-of-way until DOT needed the land for construction of the Expressway. The operators had made improvements to the sites pursuant to these representations. The operators' challenge to the competitive bidding process was based on their alleged confusion as to whether paving and other improvements were included. While granting the injunction, the Supreme Court also held that none of the operators had any rights of first refusal under "Act 100," the Act of December 7, 1979, P.L. 478, No. 100, 71 P.S. § 513, in the event DOT decided to sell the right of way, since Act 100 only applies to land which DOT owns in fee simple.

5. After the subject lease was executed, the PPA met with Secretary of Transportation, Thomas Larson (Secretary), formally requesting post-interim use of Lot 7 for construction of a multi-level parking garage, under a 99-year lease, providing DOT condemned fee title to the entire site to assure bond financing.

On September 23, 1983, the final EIS was released, selecting the scaled-down Expressway alternative. A portion of Lot 7 was to be used as a ramp from the Expressway to 15th Street. The EIS also identified Lot 7 for construction of a public parking garage by PPA to mitigate the loss of surface parking that would occur due to the Expressway construction. (764b, 766–767b; 770b).

On January 24, 1984, DOT and PPA entered into the lease for the parking garage. The agreement included tentative time tables, stating that the garage would be constructed between March 1, 1985 and September 30, 1986. The agreement, however, did not state that time was of the essence.

In July and August, 1984, DOT condemned the fee title underlying its previously acquired right-of-ways for highway purposes.[6] DOT also began exploring use of these properties for staging purposes for the Expressway. DOT designated a portion of Lot 7 as a staging area.[7] By letter dated November 21, 1984, DOT notified E–Z Parks that the lease for Lot 7 was terminated, effective March 1, 1985. On September 1, 1985 E–Z Parks vacated Lot 7.[8] Soon thereafter, DOT began using Lot 7 as a staging area; however, construction of the parking garage was delayed. *See* note 5.

6. Several of the fee owners challenged DOT's condemnations and filed actions to quiet title to their tracts, including Lot 7. Some of the actions filed by the lot owners sought to obtain fee title to tracts within Lot 7, arguing that DOT had abandoned its easements prior to 1984. *Miller v. Department Of Transportation,* 91 Pa.Commonwealth Ct. 622, 498 A.2d 1370 (1985); *Miller v. Board of Property,* 111 Pa.Commonwealth Ct. 240, 533 A.2d 819 (1987); *Bernstein Appeal,* 112 Pa.Commonwealth Ct. 368, 535 A.2d 1210, *cert. denied,* 519 Pa. 655, 546 A.2d 60 (1988) and *McCullough v. Department of Transportation,* 116 Pa.Commonwealth Ct. 215, 541 A.2d 430 (1988). The pending litigation caused a cloud on DOT's title and thus, delayed the garage project. The final appellate decision was rendered on July 26, 1989. Only then did DOT gain title in fee to Lot 7.

7. A staging area is land set aside for a project's contractor to store necessary equipment to be used in the actual construction of a nearby project.

8. On February 27, 1985, DOT and E–Z Parks entered into an agreement, allowing E–Z Parks to remain on the site because the advanced construction contract had been delayed and possession was not needed for staging purposes on March 1 as planned.

On February 19, 1985, E–Z Parks filed a petition for review to this Court, in our original jurisdiction, alleging several causes of action.[9] E–Z Parks' cause of action based on breach of lease was summarily transferred to the Board of Claims.[10]

Before the Board of Claims, E–Z Parks filed for damages, alleging breach of contract for violation of the duty of good faith negotiations and that the termination was done in bad faith. Fraud was not alleged. DOT filed an answer, denying liability and setting forth in new matter that DOT properly adhered to the termination clause because Lot 7 was needed for staging purposes.

At the hearing held from October 31, 1989 to November 3, 1989, E–Z Parks offered testimony of Robert Spear on liability and Harvey Levin on damages, in addition to offering numerous depositions and documents. DOT introduced the testimony of Secretary Larson as well as various documents.

On April 13, 1992, the Board of Claims entered an award in favor of E–Z Parks and against DOT in the amount of

9. The statutory claim gave rise to this Court's opinion in *E–Z Parks v. Larson and Philadelphia Parking Authority,* 91 Pa.Commonwealth Ct. 600, 498 A.2d 1364 (1985) *aff'd,* 509 Pa. 496, 503 A.2d 931 (1986). In *Larson,* E–Z Parks argued that the 99–year lease called for under DOT's and PPA's agreement constituted a "sale" within the terms of Act 100, in violation of E–Z Parks' right of first refusal under that section as a tenant. We refused to ignore the traditionally accepted difference between a sale and a lease, noting that Section 2002(c) of the Administrative Code, 71 P.S. § 512(c), contains the procedures for leasing of DOT real estate.

E–Z Parks argued in the alternative, "that the Department is *required* to offer Petitioner the property for sale because the property is no longer needed for transportation purposes." *Larson,* 91 Pa.Commonwealth Ct. at 605, 498 A.2d at 1367 (emphasis in original). Noting that Act 100 would require a public sale only if "the secretary determined that the land is not needed for present or future transportation purposes," we held that no such determination had been made by the secretary, thus rejecting E–Z Parks' argument that the property was no longer needed for transportation purposes.

10. Likewise, E–Z Parks' cause of action based on tortious inference with the lease against PPA was transferred to the Court of Common Pleas of Philadelphia County for further proceedings. *See also E–Z Parks v. Philadelphia Parking Authority,* 103 Pa.Commonwealth Ct. 627, 521 A.2d 71 (1987) and *E–Z Parks, Inc. v. Parking Authority,* 110 Pa.Commonwealth Ct. 629, 532 A.2d 1272 (1987).

$490,000 together with statutory interest at the legal rate of 6%, from August 1, 1988. The Board of Claims found that DOT had breached its contractual obligations to E–Z Parks by violating a duty of good faith and fair dealing because DOT had failed to inform E–Z Parks of DOT's negotiations with PPA for the parking garage. The Board also found DOT had not followed the express provisions of the termination clause.[11]

On May 12, 1992, DOT filed a petition for review with this Court. E–Z Parks filed a cross-petition for review, seeking greater damages.[12]

Although there are many facets to DOT's arguments, DOT is essentially asserting that the Board of Claims erred as a matter of law in ignoring the express terms of the lease.[13] First, DOT argues that the Board erred in imposing a heightened duty of good faith upon DOT. Because the Board improperly imposed such duty upon DOT, DOT argues that the Board perpetuated its error considering evidence outside the unambiguous agreement.

Where the terms of a contract are clearly expressed, interpretation must be determined from the language itself. *Z & L Lumber Co. of Atlasberg v. Nordquist,* 348 Pa.Superior Ct. 580, 502 A.2d 697 (1985). Only where the language in a written contract is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. *Metzger v. Clifford Realty Corp.,* 327 Pa.Superior Ct. 377, 476 A.2d 1 (1984). A contract will be found ambiguous:

> If, and only if, it is reasonably or fairly susceptible to different constructions and is capable of being understood in more senses than one and is obscure in meaning through

11. On May 1, 1992, the Board of Claims issued an amended decision, which modified only Finding of Fact No. 199, and left the order otherwise intact.

12. By order dated May 26, 1992, this Court consolidated the petition and cross-petition for review.

13. Our scope of review from an order of the Board of Claims is whether constitutional rights have been violated or errors of law have been made and whether the necessary findings of fact are supported by substantial evidence. *Department of Transportation v. Dyberry Sand & Gravel, Inc.,* 117 Pa.Commonwealth Ct. 101, 542 A.2d 650 (1988).

indefiniteness of expression or has a double meaning. A contract is not ambiguous if the Court can determine its meaning without any guide other than a knowledge of the simple facts of which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction.

*Id.* at 386, 476 A.2d at 5. The ambiguity must appear on the face of the agreement, and not be created by the parol evidence which is offered. *Merriam v. CedarBrook Realty, Inc.,* 266 Pa.Superior Ct. 252, 404 A.2d 398 (1979).

 The purpose of excluding most parol evidence is to preserve the integrity of written agreements by refusing to permit the contracting parties' attempt to change the meaning of the contract through the use of extraneous information. *Hamilton Bank v. Rulnick,* 327 Pa.Superior Ct. 133, 475 A.2d 134 (1984). The exception, however, is when fraud has been pleaded. In *Amoco Oil Co. v. Snyder,* 505 Pa. 214, 478 A.2d 795 (1984), the Supreme Court held that while it may have been unwise for the parties to have entered into an agreement, it was not the court's function to rewrite agreements for the parties and to strike a better bargain than the parties themselves were able to accomplish. "Courts are not supernegotiators. Where the language of the instrument is clear, ..., [courts] are constrained in effect to what the parties have agreed to." *Id.* at 218, 478 A.2d at 799.

 Whether a contract is ambiguous is a question of law susceptible to review by this court. *Wright v. Bristol Patent Leather Co.,* 257 Pa. 552, 101 A. 844 (1917); *Novak v. Department of Transportation,* 133 Pa.Commonwealth Ct. 220, 575 A.2d 661 (1990). We have carefully read the agreement and reviewed the termination clause and hold that it is unambiguous. However, the Board of Claims, based upon its belief that DOT had breached a good faith duty to E–Z Parks concluded that the termination clause was susceptible to a different interpretation. Thus, before we can properly determine whether the Board of Claims could consider extraneous evi-

dence outside the termination clause, we must examine the alleged duty DOT had to E–Z Parks.

## DUTY OF GOOD FAITH

DOT argues that the Board erred in holding that DOT breached the termination clause because it had a duty of good faith toward E–Z Parks. However, Pennsylvania courts have recognized a separate duty of good faith performance of contracts only in limited circumstances. *Creeger Brick v. Mid–State Bank,* 385 Pa.Superior Ct. 30, 560 A.2d 151 (1989). This duty of good faith is limited to situations where there is some special relationship between the parties, such as a confidential or fiduciary relationship. A confidential relationship exists when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." *Estate of Clark,* 467 Pa. 628, 635, 359 A.2d 777, 781 (1976). (citation omitted). A business association may be the basis of a confidential relationship "only if one party surrenders substantial control over some portion of his affairs to the other." *In Re: Estate of Scott,* 455 Pa. 429, 433, 316 A.2d 883, 886 (1974).

E–Z Parks did not claim nor did the Board of Claims find a confidential relationship between E–Z Parks and DOT. However, the Board imposed a heightened duty upon DOT because it failed to apprise E–Z Parks of DOT's negotiations with PPA. Without a finding that a confidential relationship exists, the Board could not impose a good faith duty upon DOT.

Rather, we hold that the parties had a typical landlord-tenant relationship. There is no special duty of good faith imposed by the Landlord and Tenant Act of 1951, Act of April 6, 1951, P.L. 69, 68 P.S. §§ 250–101–250–602. The termination clause was a negotiated provision, bargained for between counsel of E–Z Parks and DOT in an arms-length transaction, the terms of which cannot be ignored.

■ Further, the Board's finding that DOT's silence regarding its negotiations with PPA demonstrated bad faith is also an error of law. While active concealment may constitute fraud, "mere silence is not sufficient in the absence of a duty to speak." *Smith v. Renault*, 387 Pa.Superior Ct. 299, 564 A.2d 188 (1989). Again, such an affirmative duty to speak is normally based on the existence of a confidential or fiduciary relationship. *Federal Land Bank of Baltimore v. Fetner*, 269 Pa.Superior Ct. 455, 410 A.2d 344 (1979). DOT's failure to specifically mention PPA's interest in Lot 7 during its negotiations with E–Z Parks does not support a finding that DOT improperly induced E–Z Parks to enter into the contract. In fact, on August 11, 1983, Harvey Spear sent DOT a letter, acknowledging the interest of PPA. (693b).

■ A tenant is under a duty, if he wishes, to disaffirm the contract, and to do so promptly; he cannot continue to occupy the property and pay the rent for a period of time and then claim the right to rescind the lease agreement on the ground that he was induced to enter into the contract by the misrepresentations of the lessor or his agent. *Berger v. Pittsburgh Automotive Equipment Co.*, 387 Pa. 61, 127 A.2d 334, 336 (1956). If E–Z Parks had been misled by DOT's silence during the negotiations, then E–Z Parks was required to rescind the contract and seek damages promptly.

■ Further, actions of government officials are presumed to have been done in good faith; the challenger has a heavy burden to prove otherwise. *Swartz v. Parking Authority*, 63 Pa.Commonwealth Ct. 434, 439 A.2d 1254 (1981). A manifest and flagrant abuse of discretion must be shown. That the fact-finder might have a different opinion or judgment in regard to the action is insufficient. *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 109 A.2d 331 (1954). In a similar situation we observed:

Appellants brought in testimony to show there were other available lots for taking. The mere evidence that this lot may not be the best choice is no ground for reversal; we

cannot substitute our discretion for the administrative discretion of the Authority.

*Swartz,* 63 Pa.Commonwealth Ct. at 439, 439 A.2d at 1256–57.

We hold that the Board of Claims erred in imposing a heightened burden upon DOT and thus, could not consider evidence outside the lease agreement. Therefore, we must now review the Board of Claim's interpretation of the unambiguous lease without imposing an improper heightened duty upon DOT.

## TERMINATION CLAUSE

The *Commonwealth may terminate* this agreement within the first five years upon ninety (90) days notice *when it deems that all or any portion of the premises is required for construction* of the highway *or related transportation purposes,* but it may not terminate or convey to lease the premises to a third party prior to such termination. Thereafter, it may terminate upon thirty (30) days notice for any reason. (Emphasis added.)

(637b).

First, DOT argues that the Board of Claims erred in concluding that the termination clause must be construed against its author, DOT. The rule of construction against a drafter of a document, is applicable only if the language is ambiguous and the circumstances surrounding the execution of the document does not clarify its meaning. *Burns Manufacturing v. Boehm,* 467 Pa. 307, 356 A.2d 763 (1976). "Where a contract is the result of the joint efforts of attorneys or negotiators, then it is not to be construed against either party." *Spatz v. Nascone,* 368 F.Supp. 352, 354 (W.D.Pa. 1973). Because there is no evidence that the termination clause was drafted by DOT alone and because the termination clause is not ambiguous on its face, we hold that the Board of Claims erred in construing the termination clause against DOT.

Next, DOT argues that the Board erred by ignoring the language that authorizes DOT to terminate the agreement

within the first five years when *DOT* determines that all or a portion of the premises is *required* for construction of the highway or related transportation purposes.

The Board focused on the word "required" and found that Lot 7 was not required for construction of the "highway or related transportation purposes." [14] However, such interpretation ignores the fact that the term "required" is qualified by the language that it is DOT that must determine whether or not Lot 7 was "required" for "highway or related transportation purposes."

Each and every part of a lease must be taken into consideration and given affect, to ascertain the intent of the parties as embodied in the writing. *Marcinak v. S.E. Greene School District*, 375 Pa.Superior Ct. 486, 544 A.2d 1025, 1027 (1988). In *Boyd v. Shell Oil Co.*, 454 Pa. 374, 377, 311 A.2d 616, 618 (1973), the Supreme Court, citing *Mattocks & Bemus v. Cullum*, 6 Pa. 454, 456 (1847), noted that in construing the terms of a lease, "the intent of the parties is not to be determined merely by reference to a single word or phrase but by giving 'every part of [the document] its fair and legitimate meaning.'" Usual and generally accepted meaning must be applied, giving affect to all of the clauses' words. *Giant Markets v. Sigma Marketing Systems*, 313 Pa.Superior Ct. 115, 459 A.2d 765 (1983). Therefore, we hold that it was for DOT to determine whether or not Lot 7 was required for "highway or related purposes."

The determination of what is "required" for highway or related transportation purposes is a governmental function that DOT did not and could not avoid. *See* Section 2003(e)(1) of the Administrative Code, 71 P.S. § 513(e)(1), granting DOT the authority to acquire land in the estate "it shall determine for all transportation purposes"; Section 2003(e)(2)(ii) of the Administrative Code, 71 P.S. § 513(e)(2)(ii), granting DOT authority to acquire land, abutting transportation facilities "if

14. The Board found that DOT did not terminate the lease for staging purposes but to permit PPA to construct the parking garage and, in fact, Lot 7 was never used as a staging area, "in the real sense of the term." The Board found that DOT could have terminated only if Lot 7 was needed to construct the "footprint" of the Expressway.

the secretary determines that" it will be adversely affected by the project; and Section 2003(e)(7) of the Administrative Code, 71 P.S. § 513(e)(7), allowing DOT to sell its land, "if the secretary determines that the land is not needed for" transportation purposes.

The lease was drafted to reserve to DOT its governmental power and duty to "determine" what is "required" for "highway or related transportation purposes." Since it is DOT's statutory duty to determine what the transportation system requires, the lease must be construed with reference to DOT's view of what is required.[15]

■ Even if DOT had terminated for the sole purpose of leasing Lot 7 to PPA, as the Board had found, this still would not support the Board's conclusion that Lot 7 was not needed for "related transportation purposes."

In *E-Z Parks v. Larson*, 91 Pa.Commonwealth Ct. 600, 498 A.2d 1364 (1985), we determined that as a matter of law that the garage project in question was an example of a "highway related use" allowed under Section 6 of DOT's leasing regulations. 67 Pa.Code § 495.6(f). We also held in *Miller v. Department of Transportation*, 91 Pa.Commonwealth Ct. at 628, 498 A.2d at 1374, that the phrase "transportation purposes" in Section 2003(e) of the Administrative Code, 71 P.S. § 513(e), was accorded a broad enough interpretation to include "transportation related activities such as a parking garage in the present case, which was designed as an integral part of the highway project." [16]

15. DOT did not have unfettered discretion to terminate the lease. The lease could be terminated within the five-year term, only if, Lot 7 was required for highway or related transportation purposes. Considerable doubt existed at the time of the negotiations between DOT and PPA when the Expressway project would proceed and Lot 7 would be required. If the delay continued, as it had previously, the lease could not have been terminated.

16. Even if DOT terminated for the sole purpose of leasing Lot 7 to PPA, no factual dispute exists that a *portion* of the site was used for sewer relocation work in November 1985 and for the placement of a ramp to the Expressway in the fall of 1986. These obviously related highway purposes would alone permit DOT to terminate the lease because a

Therefore, we hold that the Board erred in usurping DOT's statutory duty to determine what was required for "highway or other transportation purposes." [17]

 The Board of Claims also ignored another portion of the termination clause. The Board again did not consider the termination clause as a whole. Rather, the Board focused on the phrase that DOT "may not terminate to convey or lease the premises to *a third party.*" However, the sentence in its entirety states that DOT "may not terminate to convey or lease the premises to a third party *prior to such determination,*" i.e. the determination that Lot 7 is needed for "highway or related transportation purposes." (Emphasis added).

As emphasized, the prohibition applies only before DOT makes the determination that any portion of the site is required for construction of the "highway or related transportation purposes." After "such determination," the first part of the sentence, allowing termination comes into play and Lot 7 could be legally transferred to third parties.

When considering two parts of a contract, the court must not interpret the sections in such a way that their meanings will be altered. The two parts must be read together and harmonized if possible. *Phillip Morris, Inc. v. Pittsburgh Penguins, Inc.,* 589 F.Supp. 912 (D.C.Pa.1983). Reading these phrases together, we hold that the prohibition of leasing to a third party no longer existed because DOT had determined Lot 7 was required for "highway or related transportation purposes."

*portion* of the premises was required for "related transportation purposes."

The Board evidently failed to recognize the conjunctive nature of the phrase "construction of the [highway] *or* related transportation purposes." (Emphasis added.) If termination was to be allowed only if DOT determined that Lot 7 was required for the footprint of the Expressway itself, the lease could have so provided. Rather, the lease allows termination if DOT determines *any* of the site is required for "construction of the [highway] *or* related transportation purposes."

17. *See generally Amtrak v. Boston and Maine Corp.,* —— U.S. ——, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992), deferring to the transportation agency's interpretation of the word "required" in a statute to mean "useful or appropriate" rather than "indispensable or necessary."

## INTERIM LEASE

 DOT also argues that the Board of Claims erred as a matter of law by finding that the subject lease was not an interim lease. We agree.

Section 2002(c) of the Administrative Code, 71 P.S. § 512(c), allows DOT to lease the right-of-way that it determines is not needed for the free movement of traffic as long as:

> The opportunity to lease any parcel of real estate shall first be offered to interested public agencies; however, if there be no such agency desiring to lease, then the department may lease to one or more private entities: ... And provided, further, That the department may lease to a private entity during the interim period between property acquisition and construction without first offering public agencies opportunity to lease the parcel.

The subject lease between E–Z Parks and DOT could be nothing more than an interim lease, as had been all prior leases between DOT and E–Z Parks. The lease covered only a term until DOT determined that Lot 7 was required for "highway or related transportation purposes." Thus, this was the only type of lease DOT could legally enter into with E–Z Parks. Section 2002(c) of the Administrative Code allows direct leasing to private parties without regard to the interest of public agencies *only during the interim period prior to construction.* Once construction begins, DOT must offer the lease to the interested public agencies. Further, page 2 of the subject lease specifically refers to Section 2002(c) of the Administrative Code and also cites 67 Pa.Code § 495.8 which is entitled "interim leases before construction."

## INTEGRATION CLAUSE

 The lease also contains an integration clause specifically initialed by E–Z Parks which states that:

> Tenant verifies that it has inspected the premises and the terms and conditions of the agreement and understands and agrees that any promises, terms or conditions in conflict

therewith, made by previous agreements or by the agents of the Commonwealth or any other parties are void. (676b).

DOT argues that the Board of Claims ignored the purpose of the integration clause in acknowledging other leases and court cases in its determination. We agree.

The very purpose of an integration clause in a lease is to clarify that the writing includes all terms of the agreement and that no other representations or promises are relied upon by the parties in reaching the agreement. *National Cash Register v. Modern Transfer Co.*, 224 Pa.Superior Ct. 138, 302 A.2d 486 (1973). The Board, thus, erroneously ignored the integration clause when it found that E–Z Parks relinquished other leases in order to obtain the lease on Lot 7.

Because we hold that the Board of Claims erred in finding that DOT improperly terminated the lease with E–Z Parks, we need not address E–Z Parks' arguments in its cross-appeals, requesting additional monetary damages. For the reasons set forth above, we reverse the Board of Claims' imposition of liability upon DOT.

## ORDER

AND NOW, this 4th day of February, 1993, the order of the Board of Claims in the above-captioned matter is hereby reversed.