Helen RILEY, Executrix of the Estate of Bernard A. Riley, Deceased, and William E. Edgeworth, Individually and Trading as Riley & Edgeworth, a Partnership,

v.

GENERAL MILLS, INC., Appellant.

No. 14917.

United States Court of Appeals Third Circuit.

Argued Dec. 15, 1964.

Decided May 5, 1965.

As Amended May 25, 1965.

H. Francis DeLone, Dechert, Price & Rhoads, Philadelphia, Pa. (Norma L. Shapiro, Philadelphia, Pa., on the brief), for appellant.

William J. Toy, Philadelphia, Pa. (Walter B. Gibbons, Philadelphia, Pa., on the brief), for appellees.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This controversy is the aftermath of an unsuccessful scheme to promote the sale of the defendant's gingerbread mix

by offering purchasers of this product an opportunity to acquire school child accident insurance through applications enclosed in the mix packages. The plaintiffs, appellees here, are the insurance agents who at the suggestion of defendant's advertising agency undertook the formulation and the steps necessary for the effectuation of this plan. They have sued General Mills for out-of-pocket expenses and for the loss of prospective commissions on insurance policies which would have been sold under the promotional scheme, alleging that these losses were caused by General Mills' repudiation of a contract. The defendant counterclaimed, alleging that it had been damaged by the failure of the plaintiffs to carry out their undertaking to obtain approval of the proposed method of selling insurance by state authorities.

The issues concerning liability were tried to a jury and submitted on special interrogatories, with the result that the defendant was found liable on the claim and the plaintiffs not liable on the counterclaim. Thereafter, the issue of damages was tried to the court, which awarded the plaintiffs $61,663.75, including about $17,000 for accrued interest and $3000 for out-of-pocket expenses.

On this appeal, General Mills has challenged both the decision on liability and the court's determination of damages.

The theory of the complaint is that all essential details of the promotional scheme, although never integrated, were worked out during the course of many conversations and written communications and that a telegram on June 8, 1955 from General Mills to one of the plaintiffs, promising to go forward with the scheme, completed the manifestation of mutual assent essential to a binding contract.

General Mills defended on the grounds, first, that no contract was entered into and, second, that if a contract was formed either the plaintiffs failed to perform their promise to obtain the approval of the insurance commissions in the then forty-eight states and the District of Columbia, or the condition that such approval be obtained was not satisfied. General Mills also counterclaimed on the theory that it incurred expenses and thereby suffered damages in reliance upon plaintiffs' promise to secure the approval of the state insurance commissioners.

In an effort to resolve the various matters in dispute the district court submitted seven interrogatories to the jury. The interrogatories and the jury's answers are as follows:

"1. Was there a valid contract entered into between Riley and Edgeworth on the one hand and General Mills on the other when the telegram (plaintiffs' Exhibit #5), dated June 8, 1955, was sent to Mr. Edgeworth at the Peerless Insurance Company office in Keene, New Hampshire?

"[Answered] Yes

"2. (If you answered the above question 'no,' you need not answer the following question.)

"When the telegram was sent had Riley and Edgeworth agreed that they would obtain approval of the promotion plan in all 48 states and the District of Columbia?

"[Answered] No

"3. (If you answered the above question No. 2 'yes,' then please answer the following question.)

"When the telegram was sent on June 8, 1955 (plaintiffs' Exhibit #5) did General Mills rely on a promise by Riley and Edgeworth that they would obtain approval of the promotion plan in all 48 states and the District of Columbia?

"[Not Answered]

"4. If you answered question No. 1 'yes,' do you find that the negotiations prior to the telegram (plaintiffs' Exhibit #5) sent by Cash to Edgeworth contemplated approval of the promotion plan in all 48 states and the District of Columbia?

"[Answered] Yes

"5. If you answered question No. 1 'yes' and question No. 2 'yes,' did Riley and Edgeworth in fact obtain approval of the promotion plan in all 48 states and the District of Columbia?

"[Not Answered]

"6. (If you answered question No. 1 'no,' you need not answer this question.)

"Is General Mills liable in damages to the plaintiffs Riley and Edgeworth?

"[Answered] Yes

"7. (If you answered question No. 1 'yes,' then answer the following question.)

"Under all the facts that you have concluded, including the answers to these interrogatories, do you find that Riley and Edgeworth are liable in damages to General Mills?

"[Answered] No."

By answering question one affirmatively and question two negatively, the jury accepted the plaintiffs' contention that a contract was formed and that the plaintiffs did not promise to obtain the approval of the promotion in all the states. But more had to be found to resolve the remaining issue in controversy—whether approval was a condition of the contract. We find that the manner in which this issue was presented to the jury constitutes reversible error.

The record shows that much of the discussion and of plaintiffs' activity before June 8, 1955 was concerned with the problem of devising such a program for the tie-in marketing of merchandise and insurance as would be satisfactory, both in form and in substance, to the public officers who administer the insurance laws of the forty-eight states and the District of Columbia. This was a matter of concern because the product with which insurance applications were to be enclosed was retailed throughout the country and General Mills contemplated nationwide advertising of the new insurance opportunity which would attend the purchase of its product. Thus, the scheme, if fully effective, would result in

the doing of some insurance business and therefore require legal approval in every state. During the course of negotiations there was discussion of the initiative to be taken by the plaintiffs with a view to solving these problems.

It is clear that for a short period after June 8, General Mills did distribute school child insurance applications with its mix, specifying that the offer was void in any state where it was illegal. In the meantime, the insurance commissions of New York, Illinois and other states indicated doubt about the legality of the promotion and withheld their approval of this method of selling insurance. The defendant then notified the plaintiffs that for this reason it was discontinuing the project.

It is not clear what the ultimate understanding of the parties was about state approvals and the importance of nationwide approval to the success of the plan. On this record, it could have been found that the failure of the scheme to win legal approval in a number of states, particularly populous ones, would constitute failure of a material condition. The defendants were entitled at least to have this issue decided by the jury. Unfortunately, the condition issue was never satisfactorily presented to the jury. Throughout this proceeding, the distinction between promised performance and condition was blurred. The breach of a promise which is part of consideration not only excuses the promisee from performing his obligations under the contract but also makes the promisor liable to the promisee for damages. The failure to occur of a condition upon which the bargain has been expressly or impliedly predicated excuses all parties to the contract from performing. Breach of a promise and failure of a condition are separate legal concepts covering distinguishable situations. But the trial court in its general instruction given to the jury on the issue of failure of condition seems to say that failure of condition could justify a refusal to continue with performance only if, in addition, the other party had promised that the

contemplated condition would be satisfied. The court charged:

"* * * where one person enters into what purports to be a contract but enters into that contract on the basis of things which may or may not occur and is so induced to enter the contract and then those things do or do not occur, then the contract in that situation becomes voidable and the person is not responsible under the contract if in fact he relied on a promise of the other party which was not given in good faith or was given but not lived up to, and if that condition caused him to enter the contract and then later that condition did or did not happen. Then he would not be liable under that contract because in very simple and plain language he relied on a promise of the other party which was not kept, which goes back to my original statement to you."

In the context of the special interrogatories, this would require an affirmative answer to question 2 as an essential basis for a defense of failure of condition. Yet, parties may and often do bargain with the understanding that performance is required only if a certain event shall occur, but without either party promising that it shall. And it is clear as a matter of law that such failure of condition excuses performance. Whitehead v. Cranford, 1953, 210 Ga. 257, 78 S.E.2d 797; Lowe v. Copeland, 1932, 125 Cal.App. 315, 13 P.2d 522. Cf. Atlas Trading Corp. v. S. H. Grossman, Inc., 3d Cir. 1948, 169 F.2d 240.

It is observed that special interrogatory 4 seems to relate to the obtaining of state approval as a condition, the failure of which might excuse the performance of both parties. In contrast, question 2 inquiries whether the plaintiff promised to obtain such approval. The view that question 4 is an inquiry about failure of condition is supported by the following explanation of that question in the trial judge's charge:

"Now what I mean by that is this, did these prior negotiations, these meetings between the parties, did they understand between them that this whole promotion plan, that one of the points involved was that it had to be approved in all forty-eight states? Was that a part of their contemplation, a part of their negotiation? Was that understood by all concerned?"

Detracting from this view is the fact that question 5 concerning whether approval was obtained in fact was to be answered only if question 2 relating to a promise to obtain approval was answered "yes", and not if question 4 was answered affirmatively.

On the other hand, the phrasing of question 4 in terms of what the parties "contemplated" may have signified to the jury no more than an inquiry whether the parties considered nationwide approval as something desirable and expected. The fact that an affirmative answer to so limited an inquiry would not dispose of any contested issue in this case may make this the less plausible interpretation of question 4, but it is one sensible reading of the language.

But whatever is the correct interpretation of question 4, it is apparent that the question could not right the misconception of the law of failure of condition conveyed to the jury in the general instruction.

■ The quoted general instruction was reversible error because it eliminated the possibility of an ultimate finding for the defendant upon the proper legal theory of failure of condition, even though the defendant had failed to prove any breach of contract by the plaintiffs.

We come now to the court's findings on the issue of damages. The plaintiffs were to be compensated for their work on the promotion by receiving from a third party, the insurer, a stated percentage of the premiums received. Some 3,305,000 applications for insurance were to be distributed, so the unknown in the formula for computing damages is the number of applications which would have been returned with the one dollar premi-

um enclosed. An estimate of a 60 to 90 percent return of all distributed applications was made by the plaintiffs, based on the experience of similar insurance offered through schools, and this estimate was incorporated by defendant's advertising agency in the agency's presentation which led to the contract. On the other hand, an officer of the defendant, experienced in food product promotions, estimated a 1 percent return. The trial court set the figure at 25 percent and awarded damages accordingly. The defendant urges that this verdict is improperly speculative.

■ A trier of fact is justified in rejecting the uncontradicted testimony of interested witnesses concerning damages. Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967; Rhoades, Inc. v. United Air Lines, Inc., 3d Cir. 1965, 340 F.2d 481. In this case we have interested witnesses from both sides contradicting each other. Our decision in the Rhoades case, supra, indicates that a trier of fact may discount a witness' opinion concerning damages in the light of countervailing considerations. Here there are countervailing considerations which could properly guide the trial judge in reaching his verdict. General Mills was prepared to spend a considerable sum of money advertising the promotion. It made a profit of only two cents on each proposed two box package in which an insurance application was to be enclosed. It must have anticipated that the offer would prove attractive to a large number of potential customers to make the promotion worthwhile. Defendant's witness' estimate, 1 percent return or approximately 33,000 applications, would contribute only a $660.00 profit to General Mills, before deducting the much larger advertising costs of the new promotion. Of course, not all who were attracted by the promotion would actually purchase the insurance, and General Mills could anticipate repeat sales; but old customers also would probably be among the group purchasing insurance. In any event, calculations starting from the number of sales needed to recover even the cost of the advertising campaign were possible and could lead the fact finder toward a rational verdict somewhere between the polar estimates of the parties. It is to be remembered that the judge here was sitting in the place of a jury, and this is an area in which the general knowledge and good sense of the fact finder can effectively operate. See 4 Sedgwick, Damages, 9th ed. 1920, § 1322 at 2663.

It is also to be considered that this insurance promotion was a unique venture. The profits that would have been generated are, of necessity, a matter now involving some "speculation". Cf. Sheldon v. Metro-Goldwyn Pictures Corp., 2d Cir. 1939, 106 F.2d 45, 51, aff'd, 1940, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825. In such cases, courts have been quite lenient in the degree of certainty required in the proof of damages. See 5 Corbin, Contracts, 1964, §§ 1020–21 at 124. In our judgment, the court achieved a satisfactory resolution of the lost profit issue.

■ We view the award of interest on lost commissions as a matter within the discretion of the trial judge.

■ The court also awarded plaintiffs $3000 for out-of-pocket expenses. Had the contract been performed, the defendant would not have been required to reimburse the plaintiffs for these expenditures. Rather, the net earnings of the plaintiffs would have been reduced that much. Since the award made for lost commissions is designed to take the place of the contemplated performance, the additional award for expenses seems inappropriate.

The determination of liability on the plaintiffs' claim will be reversed and the cause remanded for a new trial on that aspect of the case. If the defendant shall again be found liable, judgment shall be entered for the value of lost commissions and interest thereon, as heretofore determined, but the award for expenses shall be eliminated.