545 A.2d 455

Citizen Care, Inc., d/b/a Robinson Development Center, a Pennsylvania corporation, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Submitted on briefs March 28, 1988, to President Judge CRUMLISH, JR., Judge COLINS, and Senior Judge BLATT, sitting as a panel of three.

*Susan M. Mussman,* with her, *Robert B. Sommer, Kirkpatrick & Lockhart,* for petitioner.

No appearance for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., August 5, 1988:

A Department of Welfare (DPW) attorney examiner issued a recommended opinion which affirmed DPW's withholding of $340,000.00 from a monthly payment due Citizen Care, Inc., d/b/a Robinson Developmental Center (RDC). The Office of Hearings and Appeals (OHA) adopted the recommendation in its entirety. RDC appeals; we vacate and remand.

RDC is a duly licensed intermediate care facility for the mentally retarded which is dependent upon state and federal revenues to meet operating costs. Prior to July 1, 1980, RDC operated pursuant to a DPW "blueback" contract which permitted it to receive advance reimbursement for operating expenses (utilities, rent, payroll, etc.) and acquire needed physical assets (vehicles, beds, etc.). This arrangement enabled RDC to have cash on hand to meet obligations as they arose.

In an effort to maximize federal subsidization, DPW began negotiations with RDC in 1978 to convert it from a *contractual* provider to an *independent* provider pursuant to the federal Medical Assistance (MA) Program.

RDC resisted this conversion because it would necessitate changing to a system of retroactive reimbursement creating serious cash flow problems.

RDC attempted to obtain a revolving credit account from private commercial banks but was unsuccessful due to its lack of collateral, despite the intercession of former DPW Secretary Helen O'Bannon. Negotiations remained unresolved as of March 1980, when DPW formally advised RDC that the existing "blueback" contract would not be renewed. RDC responded that it would have to close its doors if no alternative could be found.

To avoid this result, DPW proposed Amendment No. 1 to the "blueback" contract under which it agreed to raise the ceiling on payments by granting a one-time increase of $340,000.00 to allow for the establishment of a funded depreciation account. By borrowing against this account, RDC would be able to meet recurring operating expenses and assure the availability of funds for the acquisition of capital assets. In return, RDC agreed to continue to provide service, now as a participant in the MA program, and to make semiannual payments to DPW based on depreciation expenses.

Amendment No. 1 became effective July 1, 1980, when the funded depreciation account was created. Although RDC produced some evidence of its attempts to make the payments required under the Amendment,[1] in 1985 DPW unilaterally terminated the account and thus withheld $340,000.00 from funds otherwise payable to RDC.

The attorney examiner found that RDC had not complied with the repayment provisions and that DPW lacked the authority to make a grant or perpetual endowment of this kind. Findings of Fact No. 29, 23. He

---

[1] Exhibits DX-1, DX-2 and DX-3.

further found that the parties mutually intended that RDC repay the $340,000.00 by calculating and paying the undepreciated value of assets acquired by RDC. Finding of Fact No. 27.

At the outset, we note that our scope of review of a DPW decision is limited to determining whether an error of law was committed, constitutional rights were violated or findings of fact were unsupported by substantial evidence. *Chatham v. Department of Public Welfare,* 90 Pa. Commonwealth Ct. 44, 494 A.2d 18 (1985).

RDC initially contends that the attorney examiner erred in concluding that DPW lacked the authority to enter into the instant agreement. We agree.[2]

In his opinion, the attorney examiner relied on *Department of Public Welfare v. Harambee, Inc.,* 21 Pa. Commonwealth Ct. 430, 346 A.2d 594 (1975), to find that RDC's interpretation of the Amendment was illegal and unenforceable because it purported to make a permanent advance or endowment. In *Harambee,* however, we invalidated a contract between DPW and a private company to develop and operate two child welfare service facilities because the funds designated in the contract had been specifically appropriated to DPW for another purpose. Further, in the context of the statutorily governed child welfare programs at issue there,[3] DPW was limited to acting only in conjunction with county governmental units or directly engaging in such services itself. Such restrictions are not present here.

---

[2] Despite the granting of five enlargements of time to file a brief in this matter, DPW failed to act and was subsequently precluded from filing a brief by order of this Court dated March 15, 1988.

[3] Section 701 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §701.

Sections 201 and 205 of Public Welfare Code[4] empower DPW to facilitate the receipt of federal funds for agencies under its regulatory authority. The attorney examiner failed to cite any authority and our research reveals none which would preclude DPW from making the transfer at issue here. Therefore, we hold that DPW possessed the authority to establish the account at issue here.[5]

RDC further contends that neither Amendment No. 1 nor the record indicates any intention that it was to repay the $340,000.00. Rather, RDC maintains that Amendment No. 1 constitutes a permanent solution to its financial problems and that the instant recoupment subjects it to the same cash flow crisis which caused its original resistence to conversion to the MA Program.

When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (1982). Where however, the terms are unclear, ambiguous or subject to varying interpretation, a court may consider extrinsic evidence of the intended meaning, *Steuart,* and may construe those terms against the party drafting the contract. *Camp Joy, Inc. v. Department of Public Welfare,* 70 Pa. Commonwealth Ct. 142, 452 A.2d 891 (1982).

Amendment No. 1, drafted by DPW, explicitly provides for the transfer of $340,000.00 to RDC for the purpose of establishing a funded depreciation account. Paragraphs 1 and 2. The Amendment also contains two provisions pertaining to the acquisition of property which clearly contemplate some form of repayment.

---

[4] Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §§201, 205.

[5] In light of our ruling on this issue, we need not address RDC's contention that DPW is estopped from denying its authority to enter into this agreement.

Paragraph 4 refers to the obtaining of property in the future and Paragraph 5 deals with title acquisition of property currently in the provider's possession. These paragraphs provide:

4. Paragraph 18(b)(1) of the Appendix GTC[6] to the Agreement is amended to read as follows:[7]

(1) If the Provider wishes to obtain any item of such property, the value of the property will be considered to be its undepreciated amount. Depreciation, for purposes of this section, will be determined in accordance with Medicare principles as set forth in the Medicare Provider Reimbursement Manual (H.I.M. 15). The Provider will compute the depreciation on such property every six (6) months, starting on December 31, 1980, and will pay to the Department, not later than one (1) month after each six (6) month period, the amount of depreciation accruing on such property until the property is fully depreciated.

5. Section A of Appendix A (The current "Medical Assistance Program Intermediate Care Facility Agreement") of the Agreement is amended by adding the following paragraph 18, as follows:

18. Title to all property in the possession of the Facility purchased with funds provided to

---

[6] This Appendix refers to standard "general terms and conditions" which are appended to contracts subject to the approval of DPW and the Department of Justice.

[7] Original Paragraph 18(b)(1) stated:

(1) If the provider wishes to retain any items of such purchased property, both parties will arrange for an independent third-party appraisal of these property items and the Provider will reimburse the Department for the value of the remaining life of the property on the basis of such appraisal.

the Facility prior to July 1, 1980 under contract with the Department lies with the Department. If the Provider wishes to obtain any item of such property, the value of the property will be considered to be its undepreciated amount. Depreciation, for purposes of this section, will be determined in accordance with Medicare principles as set forth in the Medicare Provider Reimbursement Manual (H.I.M. 15). The Facility will compute the depreciation on such property every six (6) months, starting on Decembr 31, 1980, and will pay to the Department, no later than one (1) month after each six (6) month period, the amount of depreciation accruing on such property until the property is fully depreciated.

In his decision, the attorney examiner relied in part on certain correspondence from former Secretary O'Bannon predating the Amendment and on the testimony describing the parties' beliefs to conclude that the $340,000.00 was not intended as a perpetual endowment or permanent advance. Inasmuch as the language within the Amendment delineated only mechanisms for depreciation, and failed to otherwise account for the continued existence of the fund or other collateral matters,[8] we conclude that it was appropriate for the attorney examiner to consider evidence extrinsic to the Amendment. *Steuart*.

Pursuant to his review, the attorney examiner noted the testimony of DPW witness Karen Snider, formerly the Acting Deputy Secretary of Mental Retardation, who indicated that the funded depreciation account was formulated to allow RDC to meet operating costs and

---

[8] The Amendment failed to make provision for any interest that may have been charged on borrowing from the funded depreciation account despite the fact that such interest was a reimbursable operation cost under the federal MA Program. Stipulation No. 3.

purchase necessary assets. Her dialogue with RDC counsel revealed that depreciation accruing on these assets was an allowable expense under the federal reimbursement program which RDC would then pay back to DPW. N.T., 6/17/86, p. 51. Such an interpretation is consistent with the Amendment's express repayment provisions and appears to comport with the efforts RDC made to pay such depreciation costs to DPW. Thus, it is apparent that under the Amendment the funded depreciation account would be continually depleted as new assets were purchased and federally provided depreciation reimbursement based on those assets was passed along to DPW. Essentially, DPW had advanced a loan which it could recoup through the depreciation mechanism.

Our review of the record reveals that this was not the manner in which the funding mechanism functioned. The attorney examiner found that RDC did not comply with the repayment provisions.[9] This finding is supported by evidence introduced into the record showing that RDC did not begin to make the biannual payments beginning December 31, 1980, as required by Paragraph 4 of the Amendment.

However, correspondence between the parties reveals that RDC did in fact tender a check for $33,479.00 on September 7, 1984, Exhibit DX-1, and may have attempted other such payments but was rebuffed by DPW's directive that RDC defer payments until formally requested. Exhibit DX-2.[10] Thus, evidence exists

---

[9] Stipulation No. 2 indicates that depreciation payments required by Paragraph No. 5 of the Amendment, relating to assets already in RDC's possession, are not in dispute. At issue then is the depreciation attributable to assets purchased pursuant to Paragraph No. 4.

[10] Exhibit DX-1 is a letter from the DPW Director of the Office of Program and Policy Development dated February 14, 1985,

which indicates that neither party fully complied with the contract. There is no specific finding as to the reason for RDC's delay in making payments despite evidence of certain audit disallowance appeals before OHA involving depreciation expense calculations. Furthermore, there is no finding as to whether DPW requested payments after biannual deadlines passed or why such payments were rejected when, if ever, they were tendered.

Although the attorney examiner made extensive fact findings and rendered a thoughtful discussion, we are compelled to vacate the OHA decision and remand for further findings and legal conclusions.

Specifically, we direct the attorney examiner to determine to what extent RDC received depreciation reimbursement or allowances under the federal MA Program. Assuming such reimbursements were made, the attorney examiner should then determine when and to what extent RDC attempted repayment. If substantial compliance can be shown, as RDC has alleged, it will then be necessary to determine exactly what DPW's actions were in response and whether these actions were in compliance with the contract. As is evident from Amendment No. 1, there is no demand provision for full

---

acknowledging receipt of RDC's $33,479.00 check but demanding instead return of the full $340,000.00 plus interest and return of all federal reimbursement for depreciation and all relevant assets. Through its administrator, RDC replied via two letters dated March 1, 1985 and April 30, 1985 in which it stated its understanding that the $340,000.00 was a perpetual endowment repayable only upon closure of the facility. It further delineates the inventory of acquired depreciable property and listed depreciation amounts for the fiscal years 1981 through 1984. RDC explained that its failure to timely pay these amounts was due to certain audit disallowances which were then under appeal at the Office of Hearings and Appeals.

repayment of the funded depreciation account at any time certain.

OHA's order is vacated, and this case is remanded for findings consistent with this opinion.

### ORDER

The Order of the Department of Public Welfare, Office of Hearings and Appeals, No. 23-85-133 dated February 20, 1987, is vacated and this case is remanded in accordance with the foregoing opinion.

Jurisdiction relinquished.