**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, Petitioner,**

v.

**James BROZZETTI, t/d/b/a Jim's Amusements, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 1996.

Decided Oct. 28, 1996.

---

Michael D. Alsher, Assistant Counsel, for Petitioner.

Sal Cognetti, for Respondent.

Before FRIEDMAN and LEADBETTER, JJ., and SILVESTRI, Senior Judge.

FRIEDMAN, Judge.

The Pennsylvania Department of Transportation (DOT) appeals from an order of the Board of Claims (Board) awarding James Brozzetti (Brozzetti), t/d/b/a/ Jim's Amusements, damages for breach of contract in the amount of $187,783.09, plus interest at the legal rate of six percent (6%) per annum from the date Brozzetti filed his original complaint.

In the fall of 1987, DOT invited Brozzetti, as the owner of Jim's Amusements, a sole proprietorship providing vending machine services, to bid on five contracts to place and maintain vending machines along certain Pennsylvania interstate highways.[1] (Board's Findings of Fact, Nos. 1, 3.) After Brozzetti received the bidding list from DOT,[2] Henry W. Farrell, a DOT civil engineer, informed Brozzetti that legal counsel was not necessary during the bidding process.[3] (Board's

---

1. The vending machine operation was part of a federal nationwide program to benefit designated organizations for the disabled, as well as the motoring public, in each state. Under the program, DOT received a commission from the vending machine revenues which it, in turn, paid to the Commonwealth's Bureau of Blindness and Visual Services, minus a percentage to cover roadside rest area maintenance. (Board's Finding of Fact, No. 8.)

2. The bidding list included the following five sites: Site 55, Lackawanna County; Site 56, Susquehanna County; Site 62, Pike County; Site "F," Monroe County; and Site 61, Pike County. (Board's Finding of Fact, No. 4.)

3. At the time the bids were being prepared and submitted, Farrell, an employee in DOT's Bureau of Maintenance, was in charge of establishing and overseeing the Commonwealth's interstate highway vending machine operation. (Board's Findings of Fact, Nos. 6, 10.) As such, Farrell

Finding of Fact, No. 5.) Proceeding without legal representation, therefore, Brozzetti bid on, and was awarded, all five contracts. (Board's Findings of Fact, Nos. 11–12.)

DOT prepared each of the five contracts, which contain the following term: "This contract will be for one year with an annual one year renewal option up to a maximum of two such renewals. Total contract time may not exceed three years." (Board's Findings of Fact, Nos. 13–14; Brozzetti's exhs. 1–5.) Although the five contracts are silent with regard to the method of exercising the renewal option, (Board's Finding of Fact, No. 15), each contract contains the same two clauses addressing contract termination. The two clauses, numbers 12 and 16, read as follows:

12. The Commonwealth may terminate this contract for its convenience if Commonwealth determines termination to be in its best interest. Contractor shall be paid for work completed.

16. A SERVICE CONTRACT MAY BE TERMINATED BY THE COMMONWEALTH AS FOLLOWS:

1. Within thirty days notice in writing.

2. For contractor nonperformance or inadequate performance.

3. For nonavailability of Funds, State and/or Federal.

(Board's Findings of Fact, Nos. 29–30; Brozzetti's exhs. 1–5.)

Subsequent to being awarded the contracts, and as a result thereof, Brozzetti was required to purchase a truck and special machines equipped with dollar bill units. (Board's Finding of Fact, No. 19.) Pursuant to each of the contracts, Brozzetti was required to supply two soda machines, one snack machine and one coffee vending machine at each of the five rest stops; the total purchase price for the twenty machines was $46,359.30.[4] (Board's Finding of Fact, No. 26.)[5]

On or about November 30, 1989, Brozzetti received five identical letters from DOT's Director of Maintenance and Operations, one for each contract, notifying Brozzetti that each of the contracts was being terminated effective January 14, 1990, apparently in order to allow DOT to re-bid them. (Board's Findings of Fact, Nos. 31, 35.) The letters required Brozzetti to remove all of his vending machines prior to the January 14, 1990 termination date, after which time Brozzetti sold some of the machines as well as the truck.[6] (Board's Findings of Fact, Nos. 25, 32, 36.)

On June 13, 1990, Brozzetti filed a claim against DOT, seeking damages for breach of the five contracts. DOT denied the material allegations of the complaint, and a hearing was held before the Board on March 29, 1994.

At the hearing, Brozzetti testified on his own behalf, stating that he interpreted the contract language to mean that each contract would be for a term of three years. (Board's Finding of Fact, No. 16.) In support of his

---

was responsible for establishing the location of the vending sites, setting the procedure to be followed for the bidding process and directing the execution and performance of the vending contracts. (Board's Finding of Fact, No. 7.)

4. Diane Brozzetti, Brozzetti's wife and bookkeeper for her husband's business, testified at the hearing before the Board and introduced copies of a series of documents showing the acquisition costs of the twenty vending machines installed at the vending sites and the used truck purchased to service the five sites. (Board's Findings of Fact, Nos. 20–21.)

The acquisition costs for the twenty vending machines were as follows: five coffee machines at $2,650.00 each; four snack machines at $2,909.70 each; one snack machine at $2,676.50; and ten soda machines at $1,879.40 each. (Board's Finding of Fact, No. 22; R.R. at

191a–205a.) The acquisition cost for the used truck, a 1984 GMC, was $10,230.00; however, Brozzetti was required to spend an additional $3,800.00 to repair it. (Board's Findings of Fact, Nos. 23–24.)

5. We note that the Board, by rounding off the acquisition cost for each piece of equipment, actually lists the total purchase price of the twenty machines in Finding of Fact, No. 26, at $52,000. (Board's Finding of Fact, No. 26.)

6. After the termination of the contracts, Brozzetti sold eight of the machines for a total of $10,500.00. (Board's Finding of Fact, No. 36.) Of the twelve remaining machines, ten were re-used, and only two sat idle. (Board's Finding of Fact, No. 37.) Brozzetti sold the truck to a competitor for $6,000.00. (Board's Finding of Fact, No. 25.)

own testimony, Brozzetti also introduced the testimony of Farrell. Farrell stated that, in order for Brozzetti to be able to recoup his costs while, at the same time, securing his vending operation, Farrell believed that the five contracts in question should be for a duration of three years. (Board's Findings of Fact, Nos. 17–18.)

Based upon the foregoing testimony, as well as the contractual language, the Board concluded as a matter of law that the "five Contracts in question were awarded by [DOT] to Brozzetti for a term of three years, each consisting of an initial one-year term with one year renewal options which can be exercised yearly up to a maximum of two years." (Board's Conclusion of Law, No. 2.) Although the contracts were silent as to the method of renewal, the Board noted that performance is recognized as a method of renewal, (Board's Conclusion of Law, No. 3); because Brozzetti performed under the terms of the contracts through the first year and well into the second year, the Board concluded that Brozzetti had exercised his option to renew the contracts after their initial one-year term had expired. (Board's op. at 5, 7.)

The Board then turned to the termination provisions of the contracts in order to determine whether DOT's premature termination of the contracts constituted a material breach for which Brozzetti was entitled to monetary damages. Noting that Clauses 12 and 16 are "contrary and inconsistent," (Board's Conclusion of Law, No. 4), the Board concluded that "the more specific of the two provisions will govern as a qualification over the more general term." (Board's Conclusion of Law, No. 6.) Because Clause 16 is a more specific provision than Clause 12, (Board's Conclusion of Law, No. 5), the Board concluded that Clause 16 should control with respect to the conditions of termination in the contract. (Board's Conclusion of Law, No. 7.) However, because one contract clause cannot be construed so as to negate another, *see International Organization Master, Mates and Pilots of America, Local No. 2 v. International Organization Masters, Mates and Pilots of America, Inc.,* 497 Pa. 102, 439 A.2d 621 (1981) (noting that, in construing con-

tract, each and every part of it must be taken into consideration and given effect, if reasonably possible), the Board concluded that it must construe Clauses 12 and 16 consistent with one another. (Board's Conclusion of Law, No. 10.)

Clause 12 states that DOT may terminate the contracts for its convenience if DOT determines termination to be in its best interest. Clause 16, on the other hand, states that DOT may terminate the contracts within thirty days notice in writing for: (1) contractor nonperformance or inadequate performance; or (2) nonavailability of funds, state and/or federal. Construing the provisions *in pari materia,* the Board concluded that termination is in DOT's "best interest" under Clause 12 when the contractor fails to perform or inadequately performs or when state and/or federal funds are unavailable under Clause 16. (Board's Conclusions of Law, Nos. 8–9, 13.)

■ Turning to the evidence before it, the Board found, as fact, that at no time, either during Brozzetti's contract performance or after termination of the contracts, did DOT indicate that Brozzetti performed in an improper or unsatisfactory manner, (Board's Findings of Fact, Nos. 27, 33); in fact, the Board found, to the contrary, that "[a]t all times during Brozzetti's Contract performance under the five Contracts, Brozzetti performed in a proper and satisfactory manner...." (Board's Finding of Fact, No. 27.) Moreover, the Board found that at no time, either during Brozzetti's contract performance or after termination of the contracts, did DOT indicate that state or federal funds were unavailable, (Board's Findings of Fact, No. 34); again, the Board found, to the contrary, that "[a]t no time during Brozzetti's contract performance was there a non-availability of either state or federal funds to keep the vending program in operation." (Board's Finding of Fact, No. 28.) Accordingly, the Board concluded that DOT's termination of the contracts prior to their three-year expiration was a natural breach for which Brozzetti incurred costs in the total amount of $187,-783.09.[7] (Board's Conclusion of Law, No.

---

7. Included in these costs were "loss of profits,

the costs of vending machines, related equipment

16.) Finding these costs to have been both foreseeable and proven within a reasonable degree of certainty, (Board's Conclusion of Law, No. 18), the Board ordered that an award of damages be made in favor of Brozzetti in the amount of $187,783.09, plus interest at the legal rate of six percent (6%) per annum from January, 25, 1990, the date Brozzetti filed his original complaint. It is from this order that DOT now appeals.[8]

On appeal, we are faced with three issues: (1) whether the Board erred as a matter of law in concluding that "[Brozzetti's] expectation that the Contracts were to last for a term of three (3) years was rational, reasonable and warranted under the given circumstances as stated within the instant case," (Board's op. at 5); (2) whether Brozzetti's continued performance after the original one-year term of the contracts had expired, without objection from DOT, effectively amounts to an exercise of the option to renew the contracts; and (3) whether DOT's January 14, 1990 termination of the contracts constitutes a material breach of the contracts for which damages are payable.

DOT first argues that the Board erred in concluding that the term of the contracts was for three years. Specifically, DOT argues that the Board improperly relied on the testimony of Brozzetti, who stated that he thought the contracts were for three years, and Farrell, who stated that the term of the contracts should have been for three years, because their testimony constitutes inadmissible parol evidence. We agree.

Where the terms of a contract are clearly expressed, interpretation of those terms must be determined from the language itself. *Pennsylvania Department of Transportation v. E–Z Parks, Inc.*, 153 Pa.Cmwlth. 258, 620 A.2d 712 , *appeal denied*, 534 Pa. 651, 627 A.2d 181 (1993). Only where the language in a written contract is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties.[9] *Id.* Whether a contract is ambiguous is a question of law fully reviewable by this court. *Id.* A contract will be found ambiguous:

> [i]f, and only if, it is reasonably or fairly susceptible to different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and *a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction.*

*Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 386, 476 A.2d 1, 5 (1984) (emphasis added). The ambiguity must appear on the face of the agreement and not be created by the parol evidence which is offered. *E–Z Parks.*

Here, the language setting forth the duration of each of the five contracts at issue reads as follows:

> This contract will be for *one year* with an annual one year renewal option up to a

---

and a truck purchased as a result and on reliance of the five Contracts at issue." (Board's Conclusion of Law, No. 17.)

In calculating Brozzetti's costs, the Board relied on the testimony of Brozzetti's accounting expert, Professor Andrew G. Verzilli, who, upon reviewing certain information regarding Brozzetti's loss of profits, testified that Brozzetti failed to realize $139,070.00 in revenue as a direct result of DOT's termination of the five contracts. (Board's Findings of Fact, Nos. 38–39.) The Board also relied on the testimony of Diane Brozzetti, who testified that the total loss of the vending machines and truck purchased as a direct result of Brozzetti's obtaining the contracts, minus any salvage value, was $48,713.09. (Board's Finding of Fact, No. 40.)

8.  Our scope of review on appeal from an order of the Board is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or whether the necessary findings of fact are supported by substantial evidence. *Pennsylvania Department of Transportation v. E–Z Parks, Inc.*, 153 Pa. Cmwlth. 258, 620 A.2d 712 , *appeal denied*, 534 Pa. 651, 627 A.2d 181 (1993).

9.  The purpose of excluding most parol evidence is to preserve the integrity of written agreements by refusing to permit the contracting parties' subsequent attempt to change the meaning of the contract through the use of extraneous information. *E–Z Parks.*

maximum of two such renewals. Total contract time *may not exceed* three years. (Board's Findings of Fact, Nos. 13–14; Brozzetti's exhs. 1–5) (emphasis added.) According to the plain meaning of this language, each contract was to be for an initial term of one year. Upon the expiration of this initial term, DOT and Brozzetti were no longer legally bound by a contractual relationship *unless* one or both of the parties exercised their option to renew the contracts for a second one-year term. Upon the expiration of this second term, DOT and Brozzetti, again, were no longer legally bound by a contractual relationship *unless* one or both of the parties exercised their option to renew the contracts for a third, and final, one-year term. After carefully reading the contracts and reviewing the foregoing language, we hold that, at the time the contracts here were entered into, the contracts, on their face, clearly and unambiguously bound DOT and Brozzetti for a term of one year; if, and when, either party exercised their option to renew the contracts, only then would the contracts bind DOT and Brozzetti for another one-year term.

Because the language of the contracts is unambiguous, the Board erred as a matter of law in permitting extrinsic or parol evidence by Brozzetti and Farrell regarding their contrary understanding as to the intended duration of the contracts; as noted, a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction. By relying upon this inadmissible testimony, the Board improperly concluded that, from the outset, the contracts bound DOT and Brozzetti for a term of three years.

◼ Turning to the facts before us, the initial one-year terms of each of the five contracts were as follows: (1) Site 55, Lackawanna County: 11/20/87 to 11/20/88; (2) Site 56, Susquehanna County: 11/24/87 to 11/24/88; (3) Site 62, Pike County: 12/23/87 to 12/23/88; (4) Site F, Monroe County: 1/12/88 to 1/12/89; and (5) Site 61, Pike County: 2/01/88 to 2/01/89. (Brozzetti's exhs. 1–5.) It is undisputed that DOT and Brozzetti fulfilled their respective obligations under the initial term of the contracts without incident. Although the contracts made no provision for the time or method of renewal, we agree with the Board that, in the absence of any specified manner of renewal, performance under the contracts by either party without objection is adequate to effect renewal of the contracts. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 30(2), 202(4) (1979).[10] Thus, because Brozzetti performed under each of the contracts beyond the expiration of their first terms, without objection from DOT,[11] we hold that the contracts were renewed for one and, in some cases, two additional one-year terms.[12]

Having established the duration of the contracts and their inception and expiration dates, we must next determine whether DOT's January 14, 1990 termination of the

---

**10.** Section 30(2) states as follows:

> (2) Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.

Section 202(4) states as follows:

> (4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

Here, therefore, where the offer to renew the contracts for two additional one-year terms does not prescribe the manner and medium in which the renewal was to be communicated, we believe that Brozzetti's performance under the contracts, which was "accepted or acquiesced in without objection" by DOT, was a reasonable means of communicating acceptance of the option to renew the five contracts.

**11.** According to DOT's own admission, Brozzetti continued to perform under the five contracts, forwarding to DOT "its percentage of commissions on a regular monthly basis," after the expiration of their first year. DOT, meanwhile, continued to forward the balance of the commissions, minus a percentage for administrative costs, to the Commonwealth's Bureau of Blindness and Visual Services. (DOT's brief at 4.)

**12.** As noted previously, DOT terminated each of the five contracts effective January 14, 1990. Accordingly, the contracts for Site 55, Site 56, Site 62 and Site F were in the second renewal period at the time of termination; only the contract for Site 61 was still in the first renewal period.

contracts constitutes a material breach of the contracts for which damages are payable. With respect to this issue, DOT first contends that the Board erred as a matter of law in concluding that the contracts' termination provisions, Clauses 12 and 16, are contrary and inconsistent; rather, DOT argues that the two provisions are compatible with one another because they address different reasons for termination, the former addressing termination for convenience and the latter addressing termination for inadequate performance or lack of funding. We must disagree.

■ It is well-established that, if a contract, or any part thereof, is susceptible of two logical constructions, we are required, as the Board correctly noted in its opinion, to interpret the contract against the drafting party, particularly where the contract was prepared by the drafting party's lawyer and was executed with a plaintiff, who, as here, was without the benefit of counsel. *Betterman v. American Stores Co.*, 367 Pa. 193, 80 A.2d 66, *cert. denied*, 342 U.S. 827, 72 S.Ct. 49, 96 L.Ed. 625 (1951).[13] It is also well-established that specific provisions of a contract ordinarily qualify the meaning of broad general provisions in relation to a particular subject. *See In re Alloy Manufacturing Co. Employees Trust*, 411 Pa. 492, 192 A.2d 394 (1963) (noting that specific provisions of written instrument ordinarily will be regarded as qualifying meaning of broad general terms in relation to particular subject); *J.E. Faltin Motor Transportation, Inc. v. Eazor Express, Inc.*, 172 F.Supp. 175 (W.D.Pa.), *affirmed*, 273 F.2d 444 (3d. Cir.1959) (noting that, where there is an apparent inconsistency between general and specific provisions of a contract, specific provisions ordinarily qual-

ify meaning of general provisions). Here, Clause 16 is a more specific provision than Clause 12 in relation to the same subject, termination. Construing these provisions against DOT, the drafter, we find the Board's analysis persuasive, and embrace it here in its entirety.

Under the Board's interpretation of Clauses 12 and 16, in order to properly and justifiably terminate the contracts without committing an actionable breach, DOT was required to notify Brozzetti of its intention to terminate in writing at least thirty days prior to the date set for termination and demonstrate that termination is in DOT's "best interest" by showing either that: (1) Brozzetti failed to perform or inadequately performed; or (2) that state and/or federal funds are unavailable. Because DOT failed to present any evidence to justify its premature termination of the contracts, we agree with the Board that DOT's termination of the contracts constitutes a material breach for which Brozzetti is entitled to monetary damages.[14]

■ The final issue we must consider, therefore, is the measure of damages to which Brozzetti is entitled. Generally, the measure of damages applicable in the case of a breach of contract is that the aggrieved party should be placed as nearly as possible in the same position he or she would have occupied had there been no breach. *Harman v. Chambers*, 358 Pa. 516, 57 A.2d 842 (1948); *Emerman v. Baldwin*, 186 Pa.Super. 561, 142 A.2d 440 (1958). In other words, Brozzetti is entitled to recover an amount here that would restore him to the position he would have occupied had DOT completed the term of each contract.

13. *See also Central Transportation, Inc. v. Board of Assessment Appeals of Cambria County*, 490 Pa. 486, 417 A.2d 144 (1980); *Citizen Care, Inc. v. Pennsylvania Department of Public Welfare*, 118 Pa.Cmwlth. 397, 545 A.2d 455 (1988). *But see Spatz v. Nascone*, 368 F.Supp. 352 (W.D.Pa. 1973) (holding that, where a contract results from *joint* efforts of attorneys for *both* sides, contract should not be construed against either party).

14. Although it is true, as DOT argues in its brief, that a termination without cause provision is valid under Pennsylvania law, *see Hoff Supply*

*Co. v. Allen–Bradley Co., Inc.*, 768 F.Supp. 132 (M.D.Pa.1991), the contracts at issue here, as we have interpreted them, contain no such provision. If only Clause 12, which provides that DOT may terminate for "its convenience," governed termination, we might agree that the contracts allow DOT to validly terminate the contracts without cause; however, because both Clause 12, a general provision, and Clause 16, a specific provision, govern termination, the contracts allow DOT to validly terminate the contracts only for failure to perform, inadequate performance or lack of funding.

With this in mind, we must disagree with the Board's award of $48,713.09 to compensate Brozzetti for the expense of the vending machines and the truck he purchased, minus any salvage value, in order to fulfill his obligations under the contracts. As the owner of an established vending business, Brozzetti was capable of utilizing the equipment he purchased for the contracts with DOT after the natural expiration or termination of those contracts;[15] the equipment was not peculiarly suited to performing the particular contracts at issue. *See Burks v. Sinclair Refining Co.*, 183 F.2d 239 (3d. Cir. 1950) (noting that an aggrieved party should only be permitted to recover for expenses representing items peculiarly suited for performing a contract). Moreover, even if there had been no breach, Brozzetti would have occupied virtually the same position upon the natural expiration of the contracts as he occupied after DOT's improper termination of the contracts. Whether the contracts lasted one year, three years or, as in this case, somewhere in between, Brozzetti would have been required to purchase the equipment at issue in order to satisfy his obligations under the contracts; at the end of the contracts, Brozzetti would have been left with the truck and the machines, and it would have been his responsibility either to sell or re-use them as he chose. Had the contracts been performed, DOT would not have been required to reimburse Brozzetti for the costs of the equipment; rather, Brozzetti's net earnings simply would have been reduced in that amount. Consequently, we believe that the award for these expenses is inappropriate. *See Riley v. General Mills, Inc.*, 346 F.2d 68 (3d. Cir.1965).

Although we agree with the Board that Brozzetti's damages should include loss of profits,[16] we believe that a remand is necessary to determine the amount to which Brozzetti is entitled. Professor Verzilli testified that Brozzetti failed to realize $139,070.00 in revenue as a direct result of DOT's termination of the five contracts; however, Professor Verzilli failed to specify what percentage of that figure was attributable to each of the five contracts. This becomes significant in light of our holding that the contracts were not, from the outset, for a duration of three years. While the contracts for Site 55, Site 56, Site 62 and Site F were in their second, and final, renewal period,[17] the contract for Site 61 was only in its first renewal period when terminated by DOT; thus, the contract for Site 61 does not give rise to damages for loss of profits for a third year.[18]

15. In fact, as previously noted, of the twelve machines remaining unsold after DOT's termination of the contracts, Brozzetti re-used ten, and only two sat idle. (Board's Finding of Fact, No. 36.)

16. Where, as here, there is evidence to establish a loss of profits with reasonable certainty and to show that a loss of profits was a proximate consequence of the wrong, and there is evidence that a loss of profits was within the contemplation of the parties, the failure to realize expected profits is a compensable loss resulting from a breach of contract. *Draft Systems, Inc. v. Rimar Manufacturing, Inc.*, 524 F.Supp. 1049 (E.D.Pa. 1981), *affirmed in part and remanded in part*, 688 F.2d 820 (3d. Cir.1982); *Neville Chemical Co. v. Union Carbide Corp.*, 294 F.Supp. 649 (W.D.Pa. 1968), *affirmed in part and vacated in part*, 422 F.2d 1205 (3d. Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). The amount of damages attributable to a loss of profits is an issue of fact to be decided by the fact finder, in this case, the Board. *SHV Coal, Inc. v. Continental Grain Co.*, 376 Pa.Super. 241, 545 A.2d 917 (1988), *reversed on other grounds*, 526 Pa. 489, 587 A.2d 702 (1991).

17. We note that, if DOT had been more precise in terminating each of the contracts effective their expiration dates rather than January 14, 1990, DOT, although still in breach, might have prevented the contracts for Site 62 and Site F from renewing for a third year, thereby avoiding liability for loss of profits for that year. However, even if DOT had been more precise, the contracts for Site 55 and Site 56 would have already renewed for a third year because DOT's notice of termination, dated November 30, 1990, was not even received until after the renewal period for that year had begun.

18. We must disagree with DOT, however, that those contracts terminated *after* the expiration of their first renewal term fail to give rise to damages for loss of profits for a third year as well. Relying on *Eastern Milk Producers Cooperative Association, Inc. v. Lehigh Valley Cooperative Farmers*, 568 F.Supp. 1205 (E.D.Pa.1983), DOT argues that, under Pennsylvania law, "it is unconscionable to give effect to an automatic renewal provision of a contract on the ground that a termination notice was untimely in the absence of a clause which deems that time is of the essence and a showing that the party which

Accordingly, we affirm on the issue of DOT's liability for breach, and we affirm in part and reverse in part on the issue of damages and remand this case to the Board for an itemized calculation of damages in accordance with the foregoing opinion.

### ORDER

AND NOW, this 28th day of October, 1996, the order of the Board of Claims, dated September 7, 1995, is affirmed on the issue of DOT's liability for breach, affirmed in part and reversed in part on the issue of damages, and this case is remanded to the Board for an itemized calculation of damages in accordance with the foregoing opinion.

Jurisdiction relinquished.

suffered the untimely notice was damaged or had changed its position [to its] detriment." (DOT's brief at 12.) DOT's reliance on *Eastern Milk Producers*, however, is misplaced.

If DOT had merely provided untimely *notice* of termination, but had provided proper *grounds* for termination, this case might fall within the ambit of *Eastern Milk Producers*. However, unlike *Eastern Milk Producers*, where the sole issue on appeal was whether the terminating party gave effective notice of termination pursuant to the terms of the contract, there is no question here that DOT's *notice* of termination was effective; the notice was clear and unambiguous and was provided more than thirty days in advance of the date set for termination. Unlike *Eastern Milk Producers*, therefore, our award of damages in this case does not depend upon DOT's untimely *notice* of termination, but, rather, upon DOT's improper *grounds* for termination.

This distinction is significant in that it removes the case *sub judice* from the rationale underlying *Eastern Milk Producers*. In *Eastern Milk Producers*, the court essentially held that it was unfair, in the absence of a clause providing that time is of the essence or a showing of prejudice, to hold a party to an additional one-year contract term simply because the termination letter was untimely, where the termination itself was otherwise valid. Here, however, the termination letter was effective, but the reasons for termination itself were improper. Consequently, despite its effective notice of termination, DOT is in breach of the contracts and, thus, is liable for loss of profits for the remainder of the contracts' terms.