**CLAIRTON SLAG, INC., Petitioner**

v.

**DEPARTMENT OF GENERAL SERVICES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 15, 2010.

Decided July 28, 2010.

---

James W. Kutz, Harrisburg, for designated petitioner, Clairton Slag, Inc.

Michael C. Barrett, Sr. Counsel, Harrisburg, for respondent.

Before: COHN JUBELIRER, Judge, McCULLOUGH, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

This matter comes before this Court on cross-petitions for review from a decision of the Pennsylvania Board of Claims (Board). Clairton Slag, Inc. (Clairton Slag) is the designated petitioner. The Department of General Services (DGS) is the designated respondent. The Board's decision characterizes Clairton Slag's claim regarding orders for materials placed by DGS with Lane Construction (Lane) and Golden Eagle Construction (Golden) as the "First Issue" and Clairton Slag's claim in connection with materials placed with other vendors as the "Second Issue." Clairton Slag appeals the portion of the Board's order that denied most of the damages sought by Clairton Slag relating to the "First Issue" and denied Clairton Slag's claim for damages regarding the "Second Issue" respectively. DGS appeals the Board's ruling on liability against DGS for breach of contract and an award of reasonable attorney's fees.

DGS enters into and administers a Statewide Asphalt Supply Contract on a yearly basis. The parties refer to this contract as the "SSC" and we shall do so as well throughout this opinion. The primary purpose of these contracts is to provide the Pennsylvania Department of Transportation (PennDOT) with an ongoing and convenient source of paving materials. Each year, DGS selects qualified vendors through its annual bid and award process for the SSC going into effect that year. DGS announces when bids will be accepted. Each willing vendor participates in the process by furnishing two prices for various types of paving materials to DGS: a price per ton for material to be picked up from the plant by PennDOT (F.O.B./source) and a price per ton with a mileage factor for material to be delivered to PennDOT's work sites (F.O.B./destination). These contracts are multiple award contracts and every qualified supplier that furnishes a responsive bid is awarded participation in the SSC. Each participating vendor is included in the Contractor List for the SSC in effect for that year and has the opportunity to receive orders in accordance with the SSC terms.

DGS awards contracts to vendors through a competitive sealed bidding process. In December of 2000, Clairton Slag, which had submitted a bid yearly for twenty years, did not submit a bid for the 2001 SSC. Following unsealing of the 2001 bids, Clairton Slag contacted DGS and objected to the bid awards as DGS had failed to notify it of the bid deadline. Clairton Slag also requested that it be included in the 2001 Contractor List. DGS determined that Clairton Slag had been inadvertently omitted from a notification list. DGS nonetheless denied Clairton Slag's request to be included on the 2001 Contractor List stating that Clairton Slag's failure to submit a timely bid made it ineligible to participate as a vendor under the 2001 SSC. Clairton Slag did not provide any bituminous material to PennDOT under the 2001 SSC.

Clairton Slag timely submitted a bid for the 2002 SSC. The bids for the 2002 SSC were opened and subsequently DGS notified Clairton Slag that it would be part of the vendor group for the 2002 SSC. The notification award contained a list of all suppliers for the 2002 SSC. When Clairton Slag received notification of its award, it realized that two of its competitors were not on the list, Lane and Golden. They did not submit bids for the 2002 SSC. Thereafter, Clairton Slag called Bonnie Stellfox, the DGS official responsible for administering the contract. Ms. Stellfox confirmed that Lane and Golden had not submitted bids and that consistent with past practice vendors that had not submit-

ted bids would not be permitted to participate in the 2002 SSC.

Following the bid opening, however, five vendors in addition to Lane and Golden had also contacted DGS to complain that they had not been notified of the bid deadline and/or to file a bid protest.[1] Two vendors requested that DGS rebid the 2002 SSC. DGS declined to rebid the 2002 SSC and decided, instead, to renew the 2001 SSC awards with select vendors.

Clairton Slag filed a letter objecting to the inclusion of Lane on the 2002 Contractor's List. DGS notified Clairton Slag by letter that the inclusion of Lane on the 2002 Contractors List was not the result of a solicitation of a bid or the award of a new contract, but rather the renewal of Lane's 2001 contract. DGS further stated that it did not consider Clairton Slag's letter to raise a bid protest issue.

On April 11, 2002, Clairton Slag submitted another letter to DGS as a notice of contract claim generated by the inclusion of Lane and Golden in the asphalt vendor group for the 2002 SSC. DGS' Contracting Officer denied the claim in July of 2002. Clairton Slag thereafter filed a claim with the Board.

Clairton Slag's claim alleged a breach of contract due to PennDOT ordering asphalt materials from vendors not properly on the 2002 SSC asphalt vendor list.[2] Clairton Slag sought to recover lost profits plus interest arising from orders that were improperly diverted from it and placed with competitors that were not properly on the 2002 SSC asphalt vendor list; i.e., Lane and Golden (the aforementioned "First Issue"). In addition, Clair-

ton Slag asserted, at hearing, a claim for lost profits and interest resulting from purchases of asphalt materials from vendors who had bid and, thus, were properly on the 2002 SSC, but which purchases were improperly diverted from Clairton Slag in contravention of the vendor selection terms of the 2002 SSC (the aforementioned "Second Issue"). In support of the Second Issue, Clairton Slag asserted that the Commonwealth failed to order from the lowest priced bidder and/or failed to record factors considered other than the bid price when purchasing asphalt product from vendors other than the lowest priced bidder.

The vendors which supplied materials to PennDOT during 2002–2003 in Clairton Slag's area of service were Clairton Slag, Golden, Lane, Better Materials, Lindy Paving, and Marsh Asphalt. All six of these vendors submitted prices to PennDOT to supply various types of bituminous material on an as-needed basis. In the case of Lane and Golden, the prices charged during 2002–2003 were established as part of the "renewal process" of Lane and Golden's 2001 SSC contracts.

Following trial, the Board ruled that DGS was required to have a separate competitive sealed bidding process to purchase materials outside the 2002 SSC. It determined that DGS could not utilize the renewal clause in the 2001 SSC to selectively renew the contract with only a few of the original qualified participating vendors. It noted that the renewal clause was ambiguous and that DGS' interpretation would render a subsequent part of the SSC mere surplusage. Specifically, the Board ex-

---

1. The five vendors other than Lane and Golden were not competitors in Clairton Slag's service area.

2. Clairton Slag's claim was originally comprised of two counts. The first count alleged

a breach of contract for DGS' failure to notify Clairton Slag of the bid deadline for the 2001 SSC. Clairton Slag withdrew the first count prior to trial.

plained the SSC stated the contract would be awarded to each qualified vendor. In addition, the Board explained that DGS' decision to renew the 2001 SSC with only a portion of the qualified vendors ran contrary to the Procurement Code, 62 Pa.C.S. §§ 101–4604. It concluded Lane and Golden were not part of the 2002 SSC, that the 2001 SSC was not properly renewed, and no other competitive bidding process took place to purchase materials outside the 2002 SSC. The Board found any purchases made by the Commonwealth from these two entities during 2002 and 2003 were not made in compliance with the Procurement Code.[3] By diverting asphalt orders to vendors not properly on the 2002 SSC, the Board concluded the Commonwealth breached the contract causing financial damage to Clairton Slag.

To prove damages, the Board indicated Clairton Slag must establish what portion of lost business it should have properly received under the terms of the 2002 DGS. In terms of F.O.B./source purchases, asphalt material to be picked up at the source plant, the Board indicated that the SSC indicated the bid price was only one factor to be considered. It recognized that factors such as length of haul and dead haul were to be considered when determining the lowest possible cost to the Commonwealth. To establish it was entitled to any portion of the F.O.B./source purchases made with Lane and Golden in 2002 and 2003, the Board indicated that Clairton Slag must not only establish its bid price per ton was lower than its three other local competitors that were part of the 2002 SSC, but that the combination of its bid price and the distance to its plant also presented a lower cost to the Commonwealth than any of its competitors.

According to the Board, Clairton Slag failed to present sufficient evidence to establish what portion of the F.O.B./source purchases made with Lane and Golden should have been allocated to Clairton Slag as providing the lowest responsible cost. Therefore, it concluded that Clairton Slag failed to sufficiently establish any damages on this issue.

Conversely, the Board found Clairton Slag was able to establish damages in regard to F.O.B./destination orders whereupon asphalt is delivered to a location. It concluded Clairton Slag established it was entitled to lost profits for 2,451 tons of asphalt improperly ordered from Lane and Golden. The Board awarded Clairton Slag $16,600.87 in lost profits and $6,787.30 in interest for a total of $23,388.17. In so finding, the Board explained Robert Schaefer, a representative of Clairton Slag, reviewed MORIS reports, foreman's logs, and straight line diagrams. It added Mr. Schaefer drove the routes to various job sites from Clairton Slag's plant and from Lindy, Better Materials, and Marsh asphalt to measure mileage for asphalt delivery. Using this information, the Board explained Clairton Slag calculated each vendor's total cost to PennDOT for these materials and established its cost was the lowest on three purchase orders.

The Board also awarded attorney's fees to Clairton Slag with respect to claims made on the "First Issue." It further rendered an award of costs.

█ The Board determined that it was without jurisdiction to entertain Clairton Slag's claim for damages for purchases of asphalt materials from vendors who were properly included in the 2002 SSC when the asphalt materials allegedly should have been purchased from Clairton Slag; i.e., the "Second Issue." The Board acknowledged that testimony was admitted with-

---

3. The 2002 SSC was renewed with all willing participants in 2003.

out objection on this issue that was not covered in the pleadings. Although there was a variance between the pleadings and the proof, the Board determined DGS waived any objection based on a variance between the pleadings and the proof. Nonetheless, it noted that a defense based on the failure to exhaust an administrative remedy can be raised at any time by a party or a court, *sua sponte.* The Board concluded that because Clairton Slag failed to present the Second Issue in its claim to DGS prior to commencing its action with the Board, it failed to exhaust all administrative remedies. Consequently, the Board explained it was without personal jurisdiction over the parties with respect to the Second Issue. These appeals followed.[4]

### CLAIRTON SLAG'S ARGUMENTS

**A. Clairton Slag argues that the 2002 SSC required PennDOT to purchase materials from the vendor that charged the lowest cost per ton for asphalt material. It contends that the Board erred in failing to award the extent of claimed damages for F.O.B./source purchases made with Lane and Golden in 2002 and 2003.**

Clairton Slag challenges the Board's finding that the 2002 SSC did not require PennDOT to purchase material from the vendor providing the lowest cost per ton. According to Clairton Slag, the 2002 SSC unambiguously indicated that the vendor with the lowest per ton price for F.O.B./source orders would be awarded the work. Inasmuch as the language was unambiguous, it contends the Board erroneously chose to rewrite the contract to indicate other factors were to be considered by PennDOT in determining where to purchase asphalt. In the alternative, Clairton Slag posits that if the 2002 SSC was ambiguous, it should be interpreted against the drafter. Clairton Slag suggests its interpretation of the contract is the only appropriate interpretation.

Three provisions in the 2002 SSC, Sheets F, H and I, discuss the award of purchase orders. Sheet F provides in relevant part:

*AWARD:* The F.O.B. source cost per ton will be the price the department of transportation will pay for bituminous materials purchased "FOB source of supply/loaded on department trucks". A contract award will be to each qualified contractor source bid. *after (sic) award, the county maintenance manager will issue a field purchase order, on an as needed basis, for loading material in a department truck. The department will* <u>*normally*</u> *haul material from the source that represents the* <u>*lowest responsible cost to the department after taking into consideration length of haul and dead haul.*</u> *However, in some instances, the department may select the most economic source based upon other considerations such as, but not limited to, differences in haul time due to terrain or urban congestion; length of wait at the source; cooling due to length of haul; crew productivity based on truck availability and haul distance,* details of such transactions shall be the responsibility of the county maintenance manager, will be on file in the county, and are subject to review by any awarded contractor on this contract.

---

4. Our scope of review of the decision of the Board is limited to determining whether necessary findings of fact were supported by substantial evidence, whether errors of law were committed and whether constitutional rights were violated. *Dep't of Gen. Servs. v. Limbach Co.,* 862 A.2d 713 (Pa.Cmwlth.2004).

Reproduced Record (R.R.) at 557a. (Emphasis added).

Clairton Slag points to Sheet H of the Invitation to Bid which states:

IMPORTANT

Refer to bid conditions for "Delivery Time F.O.B. Destination/Department Paver" for explanation of contract requirements for minimum and maximum time per hour.

All references to Department Paving Equipment shall include Department Wideners.

F.O.B. Source Cost/Ton is used to determine the contractor that will be awarded the Purchase Order.

Payment and applicable discounts will be adjusted prices if a Price Adjustment (excalator/descalator) is in effect at the time of delivery.[5]

R.R. at 535a. (Emphasis added).

Clairton Slag relies on the language in Sheet H to support its position that the bidder with the lowest cost per ton would be awarded each purchase order for F.O.B./source material. It contends that the use of the term "will" is mandatory, not discretionary.

■ In construing the terms of a contract, a reviewing court must strive to ascertain and give effect to the intent of the parties as found in the written contract. *Dep't of Transp. v. Pennsylvania Indus. for the Blind and Handicapped,* 886 A.2d 706, 711 (Pa.Cmwlth.2005). "When a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *East Crossroads Ctr., Inc. v. Mellon–Stuart Co.,* 416 Pa. 229, 230, 205 A.2d 865, 866 (1965). If contract terms are clear and unambiguous,

the intent of the parties will be determined from the contract itself. *Kripp v. Kripp,* 578 Pa. 82, 90, 849 A.2d 1159, 1163 (2004). When an ambiguity exists, it will be construed against the drafter of the contract. *Dep't of Gen. Servs. v. Pittsburgh Bldg. Co.,* 920 A.2d 973, 989 (Pa.Cmwlth.2007). A provision is ambiguous when it "is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Kripp,* 578 Pa. at 91, 849 A.2d at 1163. Whether a contract is ambiguous is a question of law. *Riverwatch Condominium Owners Ass'n v. Restoration Dev. Corp.,* 980 A.2d 674 (Pa.Cmwlth.2009).

■ Where there is an apparent inconsistency between general and specific provisions of a contract, specific provisions ordinarily qualify the meaning of general provisions. *Commonwealth v. Brozzetti,* 684 A.2d 658 (Pa.Cmwlth.1996). A contract should not be interpreted in a way that leads to an absurdity or renders the contract ineffective to accomplish its purpose. *Stamerro v. Stamerro,* 889 A.2d 1251 (Pa.Super.2005).

■ Sheet H does provide that cost per ton "will" be "used to determine" which vendor is awarded a F.O.B./source order. Nonetheless, Sheet F provides that F.O.B./source orders will "normally" be placed with the vendor that presents the "lowest responsible cost" to PennDOT factoring in criteria such as length of haul and dead haul. The contract is ambiguous as the document is susceptible of different constructions. *Kripp.* We believe the Board offers the correct interpretation.

We point out that Sheet H, relied upon by Clairton Slag, is not as conclusively in

5. It should be noted, as found by the Board, that this provision was apparently removed from the copy of the 2002 SSC executed by DGS and returned to Clairton Slag with no mention of its removal. The Board deemed this action inappropriate and considered Sheet H as part of the SSC. Neither party disputes this fact.

its favor as it submits. That provision does not provide that the vendor with the lowest cost per ton "will be awarded" an F.O.B./source order. That provision indicates that cost per ton will be "used to determine" what vendor is awarded a purchase order. Thus, it is a factor that is to be considered when making a purchasing determination. Sheet F specifies that PennDOT will "normally" make F.O.B./source orders with the vendor that provides the "lowest responsible cost" considering other factors such as length of haul and dead haul. Other criteria such as crew productivity and haul time are to be considered in certain instances. We believe the contract must be interpreted as it was by the Board to allow PennDOT to purchase materials at the lowest total cost to the Commonwealth.

Our interpretation of the 2002 SSC is consistent with the principle espoused in *Brozzetti* that more specific contractual provisions control the general. Sheet F specifically outlines the factors that should be considered when a F.O.B./source order is made. Sheet H contains one general consideration. We reject Clairton Slag's argument, consistent with *Stamerro*, that permitting PennDOT to consider factors other than cost per ton results in an absurdity.

■ Clairton Slag next contends that the Board's interpretation of the SSC is contrary to the Procurement Code that requires that DGS obtain the "best value" for the Commonwealth. Clairton Slag asserts that the factors affecting bid awards must be "objectively measurable." Clairton Slag interprets the 2002 SSC to allow only the following factors to be considered: (1) the costs per ton of the material, (2) the vendor's hauling costs, and (3) any vendor discounts. Clairton Slag asserts that factors mentioned in the SSC such as "length of haul or dead haul" are objectively meas-

urable, but nothing in the contract sets forth how such costs are calculated and, therefore, PennDOT is precluded from considering such factors. In addition, Clairton Slag notes that factors such as "terrain or urban congestion" and "length of wait at the source" are not objectively measurable and, consequently, PennDOT cannot use such factors in determining the lowest bidder.

The SSC is a multiple award contract, which is governed by Section 517 of the Procurement Code. That Section states, in relevant part:

(a) CONDITIONS FOR USE.—Contracts may be entered into on a multiple award basis when the head of the purchasing agency determines that one or more of the following criteria is applicable:

. . .

(5) The agency should select the contractor to furnish the supply, service or construction based upon *best value* or return on investment.

(b) SOLICITATION PROCESS.—Invitations to bid or requests for proposals shall be issued for the supplies, services or construction to be purchased.

. . .

(d) RECEIPT OF BIDS OR PROPOSALS.—Bids shall be opened in the same manner as provided in section 512(d). Proposals shall be received in the same manner as provided in section 513(d) (relating to competitive sealed proposals).

(e) AWARD.—The invitation for bids or request for proposals shall describe the method for selection of the successful bidders or offerors. There are three options:

. . .

(3) *Awards shall be made to all responsible bidders or offerors.*

(f) SELECTION.—A Commonwealth agency may select a contractor from the bidders or offerors awarded contracts under subsection (e) to furnish the supply, service or construction *based upon best value* or return on investment.

62 Pa.C.S. § 517. (Emphasis added).

The SSC is awarded through a sealed bid process and, therefore, is governed by Section 512 of the Procurement Code. Section 512 of the Procurement Code provides, in relevant part:

(a) CONDITIONS FOR USE.—Contracts shall be awarded by competitive sealed bidding except as otherwise provided in section 511 (relating to methods of source selection).

. . .

(e) BID ACCEPTANCE AND EVALUATION.—Bids shall be unconditionally accepted without alteration or modification except as authorized in this part or in the invitation for bids. Bids shall be evaluated based on the requirements set forth in the invitation for bids, which may include criteria to determine acceptability such as inspection, testing, quality, workmanship, delivery and suitability for a particular purpose. *Those criteria that will affect the bid price and be considered in evaluation for award shall be objectively measurable, such as discounts, transportation costs and total or life cycle costs.* The invitation for bids shall set forth the evaluation criteria to be used. No criteria may be used in bid evaluation that are not set forth in the invitation for bids.

(g) AWARD.—The contract shall be awarded within 60 days of the bid opening by written notice to the *lowest responsible bidder* or all bids shall be rejected except as otherwise provided in this section. . . .

62 Pa.C.S. § 512. (Emphasis added).

Section 103 of the Procurement Code defines "responsible bidder" as a "bidder that has submitted a responsive bid and that possesses the capability to fully perform the contract requirements in all respects and the integrity and reliability to assure good faith performance." 62 Pa. C.S. § 103. This same section defines "responsive bid" as a "bid which conforms in all material respects to the requirements and criteria in the invitation for bids." *Id.* The lowest responsible bidder is the one best able to perform the contract. *Shaeffer v. City of Lancaster,* 754 A.2d 719 (Pa.Cmwlth.2000). DGS may, in determining the lowest responsible bidder, consider factors other than bid price, including financial responsibility, integrity, efficiency, industry, experience, promptness and ability to carry out the project. *Id.* at 724. A contract must be awarded to the lowest responsible bidder when a public authority elects to use the public bidding process. *Id.*

Section 517 states that once bidders are awarded contracts, or are participants in a multiple award contract, the Commonwealth agency may select from those enterprises to furnish supplies "based upon best value" or return on investment. 62 Pa.C.S. § 517(e). The term "best value" is undefined in the Procurement Code. Clairton Slag directs our attention to Section 512 of the Procurement Code setting forth the sealed bidding process, the process utilized by DGS in the instant matter. That Section does state that "criteria that will affect the bid price and be considered in evaluation for award shall be *objectively measurable,* such as discounts, transportation costs and total or life cycle costs." Applying Section 512 in isolation to determine what constitutes best value in regard to Section 517 ignores the fact that all responsible bidders are included in the multiple award contract. Thus, the term "best value" cannot be solely a function of

the lowest cost at the exclusion of all other factors. Certainly, items such as length of haul and dead haul are to be considered. But other factors that may be important such as haul time, length of wait, and crew productivity must be considered by Penn-DOT when evaluating opportunity cost when choosing a vendor for F.O.B./source purchases.

**B. The Board erred in finding that Clairton Slag failed to prove its damages with respect to the F.O.B./source material ordered from Lane and Golden while the 2002 SSC was in effect.**

Clairton Slag contends that the Board erred in determining that it did not prove damages with respect to the F.O.B./source orders inappropriately placed with Lane and Golden while the 2002 SSC was in effect. Clairton Slag asserts that it demonstrated that once Lane and Golden's prices were removed from consideration, it had the lowest F.O.B./source price of the remaining vendors. Having demonstrated that it had the lowest F.O.B./source price, Clairton Slag contends that the burden shifted to DGS to prove that a different vendor could have been awarded the purchase order.[6] Clairton Slag suggests that by insisting additional evidence was required to show damages aside from the lowest bid price, the Board *sua sponte* raised an argument not made by DGS.

A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including the essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages. *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053 (Pa.Super.1999). The party who pleads the existence of certain facts bears the burden of establishing those facts. *Dep't of Pub. Welfare v. L & L Boiler Maint., Inc.,* 47 Pa.Cmwlth. 14, 407 A.2d 98 (1979).

In *Penn Elec. Supply Co. v. Billows Elec. Supply Co.,* 364 Pa.Super. 544, 528 A.2d 643, 645 (1987), the Superior Court stated:

The general rule in this Commonwealth is that the plaintiff bears the burden of proof as to damages ... The determination of damages is a factual question to be decided by the fact-finder.... The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses.... Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages.... The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof. (Citations omitted).

In ascertaining burdens of proof, and the shifting of those burdens, courts have held that, when the nonexistence of a negative fact can be established by one party more easily than another, the burden may lie on the party more able to prove the negative fact. *Thomas v. Allegheny & E. Coal Co.,* 309 Pa.Super. 333, 455 A.2d 637, 639 (1982). Additionally, when a particular party is more likely to have information that is probative of a particular issue, that party may bear the burden of coming forth with such evidence. *Mahon v. Workers' Compensation Appeal Board (Expert*

---

**6.** These contentions are based upon the assumption that the vendor who had the lowest F.O.B./source bid was entitled to be awarded the purchase order without consideration of any other factors.

*Window Cleaning)*, 835 A.2d 420 (Pa. Cmwlth.2003).

We note that the Board, acknowledging the fact that the named respondent in this matter is DGS, not PennDOT, issued an order on March 8, 2006 stating, in part:

> Although some of the documentary material may have been requested by DGS from PennDOT and passed along to Clairton Slag, it was clear from the evidentiary hearing that because PennDOT operates its own unique procurement data storage system (MORIS) DGS would not have been able to provide individual witnesses capable of interpreting the data contained in these documents. Other practical matters also appeared.... Were DGS to request documentary information from Penn-DOT and pass it along to Clairton Slag, DGS could not be expected to verify the accuracy or completeness of PennDOT's responses. On the other hand, were Clairton Slag to request information directly from PennDOT, it would be able to rely on PennDOT being directly responsible to it for the accuracy and completeness of the response pursuant to a third-party subpoena.

(citation omitted).

■ Clairton Slag bore the burden to establish the extent of its damages in this matter. *L & L Boiler; Penn Elec. Supply.* Clairton Slag chose to rely on the fact that it bid the lowest cost per ton as the sole basis for being entitled to the F.O.B./source orders improperly placed with Lane and Golden. As explained above, however, the cost per ton was not the exclusive factor to be considered in determining what vendor would be awarded a F.O.B./source order. The Board, consequently, found Clairton Slag failed to meet its burden of proof in this regard.

■ We reject Clairton Slag's argument that the burden shifted to DGS to prove that a different vendor could have been awarded the purchase order once Clairton Slag established it had the lowest cost per ton price. A shifting burden of proof is employed when one party is more likely to have information that is probative of a particular issue. *Thomas; Mahon.* As noted in the Board's March 8, 2006 Order, DGS was not better equipped than Clairton Slag to show whether PennDOT should have purchased supplies from Clairton Slag as opposed to other vendors had it not purchased from Lane and Golden.

We acknowledge that Sheet F indicates that details regarding F.O.B./source purchases shall be kept by the county maintenance manager and that the record keeping was not properly kept. The same requirement was set forth for F.O.B./destination purchases. We, however, note the following findings of the Board:

174. Mr. Schaefer drove the routes to the various job sites from Clairton Slag's plant and from the plants of Lindy, Better Materials and Marsh Asphalt to measure the mileage for asphalt delivered by Lane and Golden Eagle to PennDOT in Maintenance Districts 11–1 and 12–4 in 2002 and 2003. Using these distances, he calculated what each vendor's total cost to PennDOT for these materials delivered (bid price per ton plus hauling cost) would have been for Clairton Slag, Lindy, Better Materials and Marsh Asphalt. (N.T. 214–229; P–Ex. 49).

. . .

181. By doing these calculations for the "F.O.B. Destination/Department Paver" materials, Clairton Slag demonstrated that it was capable of providing the Board with evidence of the haul length among the competing asphalt source

plants of Lindy, Better Materials and Marsh Asphalt to the various PennDOT job sites in Maintenance Districts 11–1 and 12–4 in support of its "F.O.B. Source" allocation calculations had it wished to do so. Thus, we do not find that PennDOT's failure to record purchase "details" as required by the 2002 SSC for "F.O.B. Source" purchase and "F.O.B. Destination purchases prevented adequate proof of proper allocation of these lost sales and proof of damages in the "F.O.B. Source" category. (N.T. 155–159, 194–209, P–Exs. 37–47, 49; F.O.F. 139–145, 166–180; Board Finding).

182. The distances between the PennDOT job sites purchasing "F.O.B. Source" materials and the various source plants of Clairton Slag, Lindy, Marsh and Better Materials was available to both Plaintiff and Defendant. Further, the Board was presented with no evidence that PennDOT was asked for, but withheld, information regarding its trucking cost per mile for picking-up asphalt at the various plants. (N.T. 154–161, 166, 194–209, 214–229; P–Exs. 37–47, 49; F.O.F. 137–181; Board Finding).

183. Although it is far from clear what level of "detail" was required to be recorded by PennDOT pursuant to the terms of the 2002 SSC, even were we are to assume, *arguendo*, that specific lengths of haul for "F.O.B. Source" purchases and PennDOT cost calculations for each potential supplier were to be recorded, the fact is that this failure did not prevent Clairton Slag from acquiring adequate information to establish the portion of the "F.O.B. Source" category of "off contract" purchases to which it was entitled. It was, instead, Clairton Slag's mistaken focus on the lowest bid price as the sole determining factor which prevented it from presenting ade-

quate proof of proper allocation and damages in the "F.O.B. Source" category of sales. (F.O.F. 143–147, 148–165,-166–180,181–182; Board Finding).

184. PennDOT's failure to record the "details" of its "F.O.B. Source" purchases from Lane and Golden Eagle in 2002 and 2003 did not prevent, nor materially prejudice, Clairton Slag from ascertaining or providing the Board with adequate proof of the proper allocation of lost sales and proof of its damages for this category of its claim. (F.O.F. 183; Board Finding).

Decision dated 2/6/09, pp. 21–22.

This Court cannot disagree with the Board's ruling. Robert Schaefer, Clairton Slag's President of Administration, testified extensively in this matter. Specifically, he discussed F.O.B./source orders. He noted that there was absolutely no indication contained in any of PennDOT's records concerning why a purchase would have been made from one vendor over another considering factors other than bid price. For example, there were no costs associated with length of haul and dead haul. Mr. Schaefer nonetheless had access to a wealth of information concerning PennDOT's purchases. He viewed "[b]lanket purchase orders, tickets from the other vendors, [and] invoices from the other vendors." R.R. at 328a. Mr. Schaefer had access to the MORIS system, time sheets, as well as all foreman logs applicable to purchases made with Lane and Golden in 2002 and 2003. According to Mr. Schaefer, utilizing the foreman's logs, he was able to tell what plant supplied materials, where the materials were delivered, and when the materials were used. He had access to a straight line diagram that contains a map of every road that the State is responsible for maintenance. The straight line diagram has station marks.

Conceding the fact that PennDOT's records may not have adequately detailed why purchasing decisions were made, Mr. Schaefer established he was more than capable of calculating distance and haul cost when calculating Clairton Slag's damages in regard to F.O.B./destination orders. Inasmuch as it was Clairton Slag's burden to establish the extent of damages for the F.O.B./source orders, Mr. Schaefer could have determined what materials were purchased and from what plant. He could identify from the foreman's logs where the materials were delivered. He could have been determined if Clairton Slag was the closest plant to the work site without considering Lane and Golden. He could have assumed a hauling cost. He may not have been able to provide an exact calculation of Clairton Slag's lost revenue because, as Clairton Slag points out, Mr. Schaefer was not familiar with all the nuances of PennDOT's costs, truck location, etc. He could have, however, given consideration to more of the factors that were supposed to be considered by PennDOT when making a purchasing decision besides just bid price. Pure speculation is insufficient to establish damages. *Penn Elec. Supply.* Just and reasonable estimates, however, may be made. *Id.*

Nonetheless, Clairton Slag, relying on *Commonwealth Trust Co. of Pittsburgh v. Hachmeister Lind Co.*, 320 Pa. 233, 181 A. 787 (1935), contends that the Board's decision is error because it allows DGS to benefit from its own wrongful conduct. That case states that a defendant whose wrongful conduct has rendered it difficult to ascertain the precise damages suffered by the plaintiff is not entitled to complain that those damages cannot be measured with the same exactness and precision as would otherwise be possible. *Commonwealth Trust Co.*

 PennDOT failed to record, as required by the SSC, any reasons, calculations, or factors it considered when awarding a F.O.B./source purchase order to a vendor. PennDOT is technically not a party to this case. Rather, DGS is the named Defendant. While DGS engaged in its own wrongful conduct in this matter, the failure to maintain detailed records regarding purchases was a mistake on PennDOT's part, not DGS. Nonetheless, even if we were to apply *Commonwealth Trust Co.* to the current matter, Clairton Slag would not be entitled to additional relief. That case holds only that a defendant cannot complain that damages are imprecisely calculated when its own conduct resulted in that imprecision. The Board, however, found that Clairton Slag, notwithstanding PennDOT's failure to keep detailed records regarding purchasing decisions, failed to calculate a just and reasonable estimate of the damage based on relevant data consistent with *Penn Elec. Supply.* It held that damages could not be calculated for F.O.B./source orders assuming that only the bid price was the determining factor in determining which vendor to supply materials.[7] DGS, in the present matter, makes no complaints concerning the precision of the damages calculation.

---

7. Clairton Slag posits that the Board raised the argument that it had to show more than that it had the lowest bid price in order to establish damages for F.O.B./source orders, *sua sponte.* We point out, however, that a party is always required to satisfy its burden regardless of the issues raised by the opposing party. *See generally Wells v. Workers' Compensation Appeal Board (Skinner),* 990 A.2d 176, 182, n. 5 (Pa.Cmwlth.2010). *L & L Boiler* and *Penn Elec. Supply.* instruct that Clairton Slag had the burden in this instance to establish a reasonable extent of damages. It did not do so, however, with regard to F.O.B./source orders inasmuch as it considered the bid price as the exclusive determining factor to establish damages. A fair reading of the 2002 SSC reveals otherwise.

## C. The Board erred in finding that Clairton Slag failed to exhaust its administrative remedies with regard to the "Second Issue." [8]

Clairton Slag challenges the Board's conclusion that it failed to exhaust its administrative remedies in regard to the claim for lost profits due to PennDOT purchasing material from vendors who timely bid and were properly approved but whose bids were higher than Clairton Slag's bid. According to Clairton Slag, the purported "administrative remedy" suggested by the Board, submitting a claim to the Contracting Officer under the Procurement Code, is not an administrative remedy because the Rules of Administrative Practice and Procedure are inapplicable, and such action does not require an adjudication. Moreover, the claim is filed with a potential defendant as opposed to an arbiter, and it is not mandatory.[9]

Section 1712.1 of the Procurement Code governs the pre-litigation procedure relating to contract disputes between a contractor and the Commonwealth and requires the claim to be filed with the contracting officer within six months.[10] *Pittsburgh Bldg. Co.*, 920 A.2d at 981. Section 1712.1(b) mandates that an aggrieved contractor must initially file a claim with the Commonwealth contracting officer within six months of the date of accrual. *Id.* When a party has complied with Section 1712.1 in all material respects, the Board retains jurisdiction over a claim. *Id.*

■ Clairton Slag did not find out about the orders to the timely bidders in the Second Issue until discovery that took place long after sending the letter to the contracting officer about the First Issue. Clairton Slag failed to file a claim with the contacting officer regarding the Second Issue with DGS prior to bringing it to the Board. It has failed, therefore, to exhaust administrative remedies and the Board cannot entertain the Second Issue. *Pittsburgh Bldg. Co.*; 62 Pa.C.S. § 1712.1.

Clairton Slag nonetheless contends that even if filing a claim with the Contracting

---

**8.** Clairton Slag learned of the Second Issue during formal discovery well after it filed its complaint with the Board.

**9.** Clairton Slag asserts that DGS had notice of its claim on the Second Issue well in advance of trial and that there was no material variance in the pleadings and proof. It asserts the Board erred in dismissing Clairton Slag's claim for lost profits with regard to the Second Issue. We reiterate that the Board found DGS waived any objection based on a variance between the pleadings and the proof. Thus, there is no genuine issue in this regard as the Board ruled in Clairton Slag's favor. Nonetheless, the Board failed to provide Clairton Slag with any relief under the Second Issue for failure to exhaust administrative remedies.

**10.** Section 1712.1 of the Procurement Code provides, in relevant part, as follows:

(a) RIGHT TO CLAIM.—A contractor may file a claim with the contracting officer in writing for controversies arising from a contract entered into by the Commonwealth.

(b) FILING OF CLAIM.—A claim shall be filed with the contracting officer within six months of the date it accrues. *If a contractor fails to file a claim or files an untimely claim, the contractor is deemed to have waived its right to assert a claim in any forum.* Untimely filed claims shall be disregarded by the contracting officer.

. . .

(d) Determination.—The contracting officer shall review a claim and issue a final determination in writing regarding the claim within 120 days of the receipt of the claim unless extended by consent of the contracting officer and the contractor. If the contracting officer fails to issue a final determination within the 120 days unless extended by consent of the parties, the claim shall be deemed denied. *The determination of the contracting officer shall be the final order of the purchasing agency.*

62 Pa.C.S. § 1712.1 (Emphasis added).

Officer constitutes an administrative remedy, then it was not required to be "exhausted" as that would have been futile or ineffective. It points out that Clairton Slag objected in 2002 to the manner in which DGS was administering the SSC and put DGS on notice that any improper orders under the contract would be challenged. Yet, per Clairton Slag, PennDOT continued to order materials from other vendors, including Lane and Golden as well as those that submitted higher bid prices.

 This doctrine of exhaustion of remedies is not inflexible, and it is not applied where administrative remedies are not available or are not adequate. *Success Against All Odds v. Dep't of Pub. Welfare*, 700 A.2d 1340 (Pa.Cmwlth.1997). A remedy is inadequate if it does not allow for adjudication of the issue raised or if it permits irreparable harm to occur to the plaintiffs during the pursuit of the statutory remedy. *Pennsylvania Pharmacists Ass'n v. Dep't of Pub. Welfare*, 733 A.2d 666, 672 (Pa.Cmwlth.1999). Exhaustion has not been required where pursuit of an existing remedy would be futile. *Id.* at 672. This Court has noted that "[c]ourts should not lightly assume the futility of a party's pursuing an administrative remedy; instead, it is to be assumed that the administrative process, if given the oppor-

tunity, will discover and correct its errors." *Id.* at 673.

Perhaps DGS' contracting officer would have denied Clairton Slag's claim on the Second Issue if Clairton Slag had followed the procedures set forth in Section 1712.1 of the Procurement Code. Following such procedures, however, would not have impaired Clairton Slag in any way. We will not assume that the administrative process would not have discovered any potential error on the part of DGS and/or Penn-DOT. *Pennsylvania Pharmacists Ass'n.* Clairton Slag's argument is rejected.

## DGS' ARGUMENTS

**A. The Board erred in concluding that DGS' renewal of the 2001 SSC contract with Lane and Golden violated the Procurement Code and was therefore void and unenforceable.**

DGS contends that the Board erred in ruling that the renewal of 2001 SSC with Lane and Golden violated the Procurement Code, specifically Section 517.[11] DGS asserts that the Board's ruling was contrary to law because renewal is not subject to § 517(e) of the Procurement Code.

 DGS renewed the 2001 SSC, which was a multiple award contract, entered into pursuant to Sections 512 and 517 of the Procurement Code.[12] Since the

---

11. We reiterate, Section 517 of the Procurement Code provides as follows:

(a) CONDITIONS FOR USE.—Contracts may be entered into on a multiple award basis....

...

(e) AWARD.—The invitation for bids or request for proposals shall describe the method for selection of the successful bidders or offerors. There are three options:

(1) Awards shall be made to the lowest responsible bidder or offeror for each designated manufacturer.

(2) Awards shall be made to the two or three lowest responsible bidders or offerors for each designated manufacturer.

(3) *Awards shall be made to all responsible bidders or offerors.*

62 Pa.C.S. § 517 (Emphasis added).

12. Section 512 of the Procurement Code provides, in relevant part:

(a) CONDITIONS FOR USE.—Contracts shall be awarded by competitive sealed bidding except as otherwise provided in section 511 (relating to methods of source selection)....

62 Pa.C.S. § 512.

2001 SSC was awarded pursuant to the Procurement Code, administration of the contract during 2001 and any subsequent renewal years is subject to the requirements of the Procurement Code. Consistent with Section 517(e)(3), the 2001 SSC was awarded to *all* responsible bidders. It follows that DGS is required to offer renewal to all participating responsible bidders. We note that the Procurement Code, and the competitive bidding process, invites competition and guards against favoritism, improvidence, extravagance, fraud and corruption in the award of municipal contracts. *Philips Bros. Elec. Contractors Inc. v. Pennsylvania Tpk. Comm'n*, 960 A.2d 941 (Pa.Cmwlth.2008). Selectively renewing a prior contract after having already solicited bids on a new contract for the same services, because numerous businesses failed to bid on the new contract, speaks to favoritism and improvidence. This is particularly true when one of the bidders on the new contract was excluded from participating in the prior contract for the identical reason of failing to submit a bid.

Notwithstanding the contents of the previous paragraph, DGS contends that the Board, in finding the 2001 SSC ambiguous in regard to renewal, contends that the provisions relied upon by the Board need not be reconciled because the provisions are from two different contracts. It asserts that "both the 2001 and 2002 statewide asphalt supply contracts had almost identical provisions throughout, and in particular, *the award and renewal provisions are the same.* However, when analyzing this issue, what the Board is actually doing is comparing the renewal provision of the 2001 contract with the award provision of the 2002 contract." Brief of Designated Respondent, p. 28.

The renewal provision of the 2001 SSC provides:

> *Option To Renew:* The contract(s) or any part of the contract(s) may be renewed for an additional three (3) one (1) year terms by mutual agreement between the Commonwealth and the Contractor(s). If the Contract(s) is/are renewed the same terms and conditions shall apply. . . .

R.R. at 507a.

Sheet F, as stated above, provides: in relevant part:

> A contract award will be to each qualified contractor source bid.

R.R. at 501 a.[13]

A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Kripp.* Whether an ambiguity in a contract exists is a question of law. *Riverwatch Condominium Owners Ass'n.* An ultra vires action is one that is performed without authority to act and beyond the scope of legal authorization. *Butler v. Local 585,* 744 A.2d 338 (Pa.Cmwlth.1999). When a government entity enters into a contract beyond its authority, the contract is void and unenforceable. *Bolduc v. Bd. of Supervisors of Lower Paxton Twp.,* 152 Pa. Cmwlth. 248, 618 A.2d 1188 (1992).

When the contract is read as a whole the renewal provision is neither clear nor explicit. There is ambiguity inasmuch as the 2001 contract can be read in more than one sense. *Kripp.* Clairton Slag notes one provision of the contract specifies that a contract award will be to each qualified contractor source. It questions that if the

---

**13.** DGS' argument that the Board was interpreting two different contracts is circuitous. DGS concedes that the 2001 SSC and 2002 SSC contain the exact same award and renewal provisions.

contract must be awarded to each qualified bidder, then how can the contract be selectively renewed. DGS posits, however, that the renewal provision indicated that the 2001 contract could be renewed with all or part of the respective bidders at its choosing. DGS interpretation, however, is contrary to the Procurement Code. We reiterate that Section 517(e)(3) requires that awards be made to all responsible bidders. DGS cannot circumvent this directive by selectively renewing an award with only certain contractors. DGS interpretation allows for ultra vires action. *Butler.* Its interpretation cannot stand. *Bolduc.*[14]

## B. The Board erred in awarding attorney's fees to Clairton Slag.

DGS challenges the Board's decision to award attorney's fees related to the First Issue to Clairton Slag. DGS asserts that Clairton Slag is not entitled to attorney's fees under the Prompt Pay Act, 62 Pa.C.S. §§ 3931–3939, a subchapter of the Procurement Code, insomuch as it contends the Prompt Pay Act is applicable only to public works construction contracts. DGS posits Clairton Slag's contract was not a construction contract, rather one for supplies.

It has been held that the clear intent of the Prompt Pay Act is to level the playing field between contractors and subcontractors when they are working on public projects. *Zimmerman v. Harrisburg Fudd I, L.P.*, 984 A.2d 497, 501, n. 5 (Pa.Super.2009). The Prompt Pay Act requires contractors on public projects to honor their contractual obligations and pay subcontractors for all items satisfactorily completed. *Pietrini Corp. v. Agate Constr. Co.*, 901 A.2d 1050 (Pa.Super.2006).

The Prompt Pay Act applies to "contracts" entered into by a government agency through competitive sealed bidding or competitive sealed proposals. 62 Pa. C.S. § 3901. The term "contract," as it is used in the Prompt Pay Act, is defined as "a contract exceeding $50,000.00 for *construction* as defined in section 103 . . . ." 62 Pa.C.S. § 3902. The term "construction," as set forth in Section 103 of the Procurement Code, is defined as "[t]he process of building, altering, repairing, improving or demolishing any public structure or building or other public improvements of any kind to any public real property . . . ." 62 Pa.C.S. § 103.

Section 3935 of the Prompt Pay Act allows for a penalty award for payments withheld in bad faith. That same provision permits an award of attorney's fees if the governmental agency, contractor, or subcontractor acted in bad faith. 62 Pa.C.S. § 3935. This provision, however, is only applicable to contracts for "*construction.*" 62 Pa.C.S. § 3902. The term construction encompasses building, altering, repairing, improving or demolishing any public structure. 62 Pa.C.S. § 103.[15] The contract at issue in this mat-

14. In light of our determination that the 2001 SSC could not be selectively renewed with only a portion of the responsible vendors, we need not discuss whether DGS altered the terms of the 2001 SSC when it renewed the 2001 SSC with select vendors.

15. It must be acknowledged that Section 103 of the Procurement Code that provides the definition of "construction" referenced above also provides a general definition for the term "contract." It defines a "contract" as a "type of written agreement, regardless of what it may be called, *for the procurement or disposal of supplies,* services or construction . . . ." 62 Pa.C.S. § 103. Section 103 of the Procurement Code, however, indicates that the definitions contained therein are subject to additional definitions contained in subsequent provisions of the Procurement Code. *Id.* The Prompt Pay Act is a chapter and subsequent provision of the Procurement Code that contains its own definitions, including a definition for the term "contract." Section 3902

ter was not for construction. Rather, the contract at issue was a mere supply contract. Thus, the Prompt Pay Act is inapplicable.

DGS next contends that the Board, as an administrative tribunal, does not have the authority to award attorney's fees under the Judicial Code. The Board is an independent administrative body that adjudicates claims arising from contracts entered into by the Commonwealth. *Employers Ins. of Wausau v. Dep't of Transp.*, 581 Pa. 381, 865 A.2d 825 (2005).

 Section 2503 of the Judicial Code authorizes courts to award reasonable counsel fees where a litigant has been guilty of specific misconduct.[16] *Pennsylvania Board of Probation and Parole v. Baker*, 82 Pa.Cmwlth. 86, 474 A.2d 415 (1984). Section 2503, however, is limited in scope and is applicable only to components of the "unified judicial system."[17] *Id.* at 417. *See also Independence Blue Cross v. Workers' Compensation Appeal Board (Frankford Hosp.)*, 820 A.2d 868 (Pa.Cmwlth.2003). The Board of Claims is not part of the unified judicial system as set forth in Section 301 of the Judicial Code. It is without authority to award attorney's fees under Section 2503 of the Judicial Code. *Baker; Independence Blue Cross.* Further, *assuming arguendo*, that the Board was capable of awarding fees under the Judicial Code, it is unlikely that Clairton Slag has been subject to arbitrary, vexatious, dilatory, or bad faith conduct during the commencement or pendency of the instant litigation as required by Section 2503 of the Judicial Code. Any possible alleged improper conduct took place prior to the time Clairton Slag filed its complaint with the Board.[18]

## Conclusion

Based on our review, we conclude that the Board committed no error in finding

16. Section 2503 of the Judicial Code states in part:

The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:

. . .

(7) Any participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct *during the pendency of a matter.*

. . .

(9) Any participant who is awarded counsel fees because the conduct of another party *in commencing the matter or otherwise was arbitrary, vexatious or in bad faith.*

42 Pa.C.S. § 2503. (Emphasis added).

17. The judicial power of the Commonwealth shall be vested in a "unified judicial system." 42 Pa.C.S. § 301. The unified judicial system is composed of the Supreme Court, Superior Court, Commonwealth Court, Courts of common pleas, Community courts, Philadelphia Municipal Court, Pittsburgh Magistrates Court, Traffic Court of Philadelphia, and Magisterial district judges. *Id.*

18. Because the Board was without authority to award attorney's fees under either the Prompt Pay Act or Section 2503 of the Judicial Code, we need not address DGS's contentions that the Board's findings regarding bad faith are internally inconsistent and unsupported by substantial evidence.

---

of the Prompt Pay Act specifies that the definitions contained therein are applicable to that chapter. While the general definitions of the Procurement Code provide that a "contract" includes an agreement for "supplies" as is the contract in the matter before us, the Prompt Pay Act limits the term "contract" to agreements for "construction." Inasmuch as Section 103 of the Procurement Code specifies that the definitions set forth therein are subject to definitions that may appear later in the Procurement Code that are applicable to specific provisions, the definition for "contract" in Section 103 is not applicable to the instant matter. This is consistent with the principle of statutory construction that more specific provisions prevail over the more general ones. *Insurance Fed'n of Pa. v. Insurance Dep't*, 929 A.2d 1243 (Pa.Cmwlth.2007).

PennDOT's vendor selection regarding F.O.B./source purchases under the 2002 SSC was not a sole function of lowest cost per ton. We further see no error in the award of damages or the Board's conclusion that Clairton Slag failed to exhaust its administrative remedies with regard to the "Second Issue." DGS's renewal of the 2001 SSC contracts with Lane and Golden violated the Procurement Code, was void, and unenforceable as found by the Board. With the exception of the award of attorney's fees, the Board's opinion is affirmed.

## ORDER

AND NOW, this 28th day of July, 2010, the order of the Board of Claims is reversed to the extent it awarded Clairton Slag attorney's fees in this matter. Its order is affirmed in all other respects.